**ROBERTS & SCHAEFER COMPANY**

v.

**LOCAL 1846, UNITED MINE WORKERS OF AMERICA,**
Appellant.

No. 86–3325.

United States Court of Appeals,
Third Circuit.

Argued Jan. 21, 1987.

Decided March 2, 1987.

Deborah Stern (argued), Michael H. Holland, Washington, D.C., for appellant.

Michael D. Glass (argued), Anthony J. Polito, Polito & Smock, P.C., Pittsburgh, Pa., for appellee.

Before GIBBONS, Chief Judge, WEIS and HUNTER, Circuit Judges.

**OPINION OF THE COURT**

WEIS, Circuit Judge.

An arbitrator interpreted a collective bargaining agreement to mean that, despite rather clear contractual language, a construction firm was required to use only subcontractors that recognized a particular union. The district court vacated the award, concluding that it did not draw its essence from the agreement. Although we do not disagree with the district court's interpretation of the contract, we will reverse because the record provides some, albeit minimal, support for the arbitrator's decision.

Roberts & Schaefer Company was a party to a national collective bargaining agreement requiring that under certain conditions subcontracted construction work would be performed within the jurisdiction of the United Mine Workers. The dispute here arose when Roberts & Schaefer subcontracted work at a coal mine to a firm which had a collective bargaining agreement with the United Steelworkers of America.

The UMW charged that this subcontract was a breach of its collective bargaining agreement. When Roberts & Schaefer refused to recognize a grievance filed by the UMW, the union obtained a district court order compelling arbitration.

The principal issue before the arbitrator was the meaning and effect of the enabling clause in the National Coal Mine Construction Agreement of 1981, to which Roberts & Schaefer was a signatory. That section provided in pertinent part:

"This agreement covers all work related to the development, expansion or alteration of coal mines ... and all other such coal-related work that is performed at or on coal lands by the members of the association [of Bituminous Contractors] for coal mine operators which require such construction work to be performed

under the jurisdiction of the United Mine Workers of America."

The UMW argued that the contract for the work being performed by Roberts & Schaefer at the mine was of the type contemplated by the National Coal Mine Construction Agreement. Roberts & Schaefer, however, contended that by its terms the Agreement did not apply to the subcontract because Consol Pennsylvania Coal Company, the operator, did not "require" the construction to be performed under the jurisdiction of the UMW. In urging that the work was within the scope of the Construction Agreement, the union relied on events occurring during the contract negotiation sessions and on an unwritten understanding of the parties.

The identical enabling clause had been included in the 1978 Construction Agreement, where it was keyed to a provision of the National Bituminous Coal Operators Agreement requiring the mine operators to use contractors who had recognized the UMW. In 1980, the proviso in the Operators Agreement was held to be an illegal union signatory clause. *Amax Coal Co. v. NLRB*, 614 F.2d 872 (3d Cir.1980), *rev'd on other grounds*, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). The UMW, concerned with the effect of the *Amax* decision, attempted to change the language of the enabling clause in a variety of ways while negotiating the 1981 Construction Agreement. The Contractors' Association, however, accepted none of the proposed changes.

In testimony before the arbitrator, the Roberts & Schaefer witnesses stated that the contractors preferred not to be under the jurisdiction of the UMW because its labor costs were higher than those of other unions, such as the United Steelworkers. Consequently, during the negotiations the contractors resisted the UMW efforts to make language changes aimed at retaining jurisdiction over all phases of coal mine construction work.

Willard A. Esselstyn, a UMW representative, conceded that he had been unsuccessful in securing changes in the enabling clause wording. He testified that during the bargaining sessions he had expressed the union's concern that "labor unrest" might occur if non-UMW labor were used in coal mine construction. The operators' representative had advised him that they shared similar views and that they were not "looking to buy problems" or "to have trouble." The bargaining representative for the contractors also had said, "we are not looking for any trouble either."

Esselstyn testified, "it was understood by me that if you are going to do construction at a mine site, you are talking about labor unrest if you bring in, say nonunion [non-UMW]." It was his understanding that if a mine operator chose a UMW construction firm, the general contractor would abide by the terms of the Agreement and limit subcontracting to companies also recognizing the UMW.

Roberts & Schaefer witnesses denied that the parties had reached any such understanding. The contractors had relied on the terms of the enabling clause as written and had refused to bargain away the language that they considered favorable to them after *Amax*.

Finding for the union, the arbitrator stated he could not find an Agreement provision that gave Consol the right to tell Roberts & Schaefer

"that it could subcontract part or all of the work without regard to its (R & S) obligations under a labor agreement; nor can the arbitrator find any Agreement provision that affords such right to R & S if acting on its own without first determining whether or not it had any contractual obligations. If the 1981 ... Agreement had been intended to provide an operator or a prime contractor with such authority the language would necessarily have been clear and unequivocal."

He therefore determined that the enabling clause did not authorize a contract signatory to "avoid the contractual commitment he made in the substantive language" of the agreement.

Dissatisfied, the company sought vacation of the award in the district court. The case was referred to a magistrate for con-

sideration and recommendation. Recognizing that the scope of review was narrow, the magistrate nevertheless concluded that in light of the record before the arbitrator, the award did not draw its "essence" from the contractor's agreement of 1981. The district judge adopted the magistrate's report and entered summary judgment for the company, thus vacating the arbitrator's decision.

The parties do not dispute that the arbitration clause is very broad. It applies "[s]hould differences arise between the [union] and the Employer as to the meaning and application of the provisions of this Agreement." The law is clear that because the parties have bargained for an arbitrator's construction of the contract, his decision governs and the court should not vacate the award because of a difference of interpretation. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Supreme Court has repeated the admonition that "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983).

The opinions of this court over the years have been faithful to the teachings of the Supreme Court. In *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969), we said that an arbitration award draws its essence from the collective bargaining agreement if "the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties intention." A court may disturb the award only if there is a disregard of the contract "totally unsupported by principles of contract construction and the law of the shop." *Id.*

Even when the award was "dubious," and the result one that we would not have reached had the matter been submitted to the court originally, we have upheld the arbitrator's decision. In *Kane Gas Light and Heating Co. v. International Bhd. of Firemen and Oilers*, 687 F.2d 673, 679 (3d Cir.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983), we said, "[a]fter 'bargaining' for the decision of this arbitrator, the Company cannot avoid his decision merely because the arbitrator may have reached an incorrect result." In that same case, we admittedly found it "as difficult as does the Company to comprehend the arbitrator's determination." *Id.*

"It is irrelevant whether the courts agree with the arbitrator's application and interpretation of the agreement." *Arco-Polymers, Inc. v. Local 8-74*, 671 F.2d 752, 755 (3d Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982). "Where ... it is possible that the arbitrator could have been interpreting the contract, his failure to apply correct contract principles is irrelevant; the arbitrator's contract interpretation must be irrational before a reviewing court may disturb the award." *Id.* at 757. *See also Super Tire Engineering Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 125 (3d Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984).

The issue before us, therefore, is not whether the arbitrator correctly construed the contract, but whether his interpretation is irrational. The arbitrator's opinion is not a model of clarity. Read generously, however, it suggests that because the language of the enabling clause had not been changed, the UMW and the contractors intended to continue the arrangement as it had existed in the past. That is, when a signatory contractor worked at a mine where the operator was a party to the Bituminous Coal Operators Agreement, subcontracting would be limited to those firms recognizing the UMW. Such was the understanding of the UMW negotiator, who testified to that effect before the arbitrator. Additional support was provided by an affidavit of a UMW staff attorney.

The Contractors' Association realistically did not expect any substantial change in its relationship with the union after the 1981 contract was signed. The Association's chief negotiator was emphatic in describing his refusal to accede to the UMW's request for a change of language in the enabling

clause. He testified that during the negotiations he had said to the UMW representative,

"Look, we don't know why you are so fearful, you know. You guys have a history of striking and shutting down coal mines and entire companies in the whole industry at the drop of a hat. We don't think that very many coal companies who are organized by the UMW are going to risk a wildcat strike and shut down by not requiring the work to be done under this contract, or by the United Mine Workers."

In context, that statement was part of the company's argument and was aimed at bolstering its position that the enabling clause should be applied as written. Nevertheless, the testimony makes very clear that when the UMW negotiator spoke of "trouble" and "labor unrest," the Contractors' Association understood that wildcat strikes and shut downs were not out of the question.

The arbitrator could, and apparently did, seize on this phase of the evidence to conclude that although the contractors fought any alteration of the enabling clause, the parties had reached an unarticulated understanding to maintain the status quo. On that basis, the arbitrator's award cannot be said to be irrational.

We recognize that the weight of the evidence in the record is to the contrary and supports the interpretation of the contract that the district court adopted. Nevertheless, it was the decision of an arbitrator that the company bargained for, and it is that decision with which it now must cope.

Although we have serious doubts about the correctness of the arbitrator's decision, the courts are not free to set it aside. Accordingly, the judgment of the district court will be vacated, and the case will be remanded with instructions to enter judgment for the union.

JAMES HUNTER, III, Circuit Judge, dissenting:

I agree with the majority that the district court's interpretation of the contract is correct; I also agree that our scope of review of a labor arbitrator's decision is very narrow. I believe, however, that there is a limit to the deference we owe to the arbitrator's decision, and that "the award may not stand if it does not meet the test of fundamental rationality." *Swift Industries, Inc. v. Botany Industries, Inc.*, 466 F.2d 1125, 1131 (3d Cir.1972). Because I detect no rational basis to the arbitrator's decision, I cannot join in the judgment of the court.

As an initial matter, I note that the arbitrator's opinion takes a position that was urged by neither party to the arbitration. Roberts & Schaefer urged that the plain language of the National Coal Mine Construction Agreement of 1981 ("the Agreement") should control. The Union argued that a signatory to the Agreement is required to use UMW-affiliated subcontractors on any construction project for a *coal mine operator that has signed a collective bargaining agreement with the UMW.* The arbitrator ruled, however, that a signatory to the Agreement is required to use UMW-affiliated subcontractors on *all* construction projects. Thus, the arbitrator's unprecedented expansion of the Agreement gives the UMW *more* than it had prior to the *Amax* decision. There is not a scintilla of evidence in support of this interpretation. In fact the Union did not even suggest such a construction. This omission itself is significant and indicative of the irrationality of the arbitrator's decision.

The Union's interpretation of the enabling clause is equally unsupportable; there is no doubt that it is discordant with the plain language of the clause. Further, after the *Amax* decision, signatories to the 1978 National Coal Mine Construction Agreement were not required to use UMW-affiliated subcontractors unless specifically required to do so by the coal mine operator. In other words, Roberts & Schaefer's construction of the enabling clause described the *status quo* just prior to the formation of the Agreement. Since the Agreement merely carried forward the language from the 1978 Mine Construction Agreement, one must conclude that the parties to the Agreement intended to maintain the *status*

*quo.* This conclusion is inescapable in light of the history of the negotiations leading to the Agreement. The undisputed evidence shows that on no less than five occasions UMW negotiators offered amendments to the enabling clause that would have made the plain language of the clause consistent with the interpretation that the Union urged at the arbitration. The negotiator for Roberts & Schaefer rejected all five amendments, and the language from the 1978 Mine Construction Agreement was carried forward. I simply cannot fathom how any rational factfinder could conclude that Roberts & Schaefer implicitly agreed to that which it repeatedly and consistently rejected.

The only evidence urged in support of the Union's position is the testimony of Willard Esselstyn, a UMW representative. Esselstyn testified that during the Agreement negotiations, he tried on numerous occasions to get the negotiators for Roberts & Schaefer and the other contractors to agree to an amendment to the enabling clause. When such attempts failed, Esselstyn stated, "Look, you don't want to buy a bunch of trouble, a bunch of labor unrest." The opposing negotiator responded, "No, we don't want that. We want to get a settlement." From this exchange of truisms, we are to infer mutual assent to language that was repeatedly rejected and that does not appear in the Agreement. In my view, a reasonable person could not make such an inference.

In sum, the arbitrator gave to the Union that which it could not obtain in a fair negotiation. While the scope of our review is narrow, I do not believe that we are powerless to correct such a clear abuse. I would affirm the order of the district court.