W. R. GRACE & CO. *v.* LOCAL UNION 759, INTERNA-
TIONAL UNION OF THE UNITED RUBBER, CORK,
LINOLEUM & PLASTIC WORKERS OF AMERICA

No. 81–1314.   Argued February 28, 1983—Decided May 31, 1983

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Peter G. Nash* argued the cause for petitioner. With him on the briefs were *Dixie L. Atwater* and *Kevin T. O'Reilly*.

*Carter G. Phillips* argued the cause for the Equal Employment Opportunity Commission as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee* and *Deputy Solicitor General Wallace*.

*Laurence Gold* argued the cause for respondent. With him on the brief were *Danny E. Cupit, Charles Armstrong, Michael H. Gottesman,* and *Robert M. Weinberg*.*

*Robert E. Williams, Douglas S. McDowell,* and *Jeffrey C. McGuiness* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

JUSTICE BLACKMUN delivered the opinion of the Court.

Faced with the prospect of liability for violations of Title VII of the Civil Rights Act of 1964, as amended, petitioner signed with the Equal Employment Opportunity Commission (Commission or EEOC) a conciliation agreement that was in conflict with its collective-bargaining agreement with respondent. Petitioner then obtained a court order, later reversed on appeal, that the conciliation agreement should prevail. The issue presented is whether the Court of Appeals was correct in enforcing an arbitral award of backpay damages against petitioner under the collective-bargaining agreement for layoffs pursuant to the conciliation agreement.

## I

### A

In October 1973, after a lengthy investigation, the EEOC's District Director determined that there was reasonable cause to believe that petitioner W. R. Grace and Company (Company) had violated Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §§ 2000e to 2000e–17 (1976 ed. and Supp. V), by discriminating in the hiring of Negroes and women at its Corinth, Miss., plastics manufacturing facility. App. 2. In addition, the Director found that the departmental and plantwide seniority systems, mandated by the Company's collective-bargaining agreement with respondent Local Union No. 759 (Union), were unlawful because they perpetuated the effects of the Company's past discrimination. The Company was invited, pursuant to § 706(b) of the Act, 42 U. S. C. § 2000e–5(b), to conciliate the dispute. Although the Commission also invited the Union to participate, the Union declined to do so.

### B

A collective-bargaining agreement between petitioner and respondent expired in March 1974, and failed negotiations led to a strike. The Company hired strike replacements, some

of whom were women who took Company jobs never before held by women. The strike was settled in May with the signing of a new agreement that continued the plant seniority system specified by the expired agreement. The strikers returned to work, but the Company also retained the strike replacements. The women replacements were assigned to positions in the Corinth plant ahead of men with greater seniority. Specifically, the Company prevented men from exercising the shift preference seniority (to which they were entitled under the collective-bargaining agreement) to obtain positions held by the women strike replacements. The men affected by this action filed grievances under the procedures established by the collective-bargaining agreement.

The Company refused to join the ultimate arbitration. Instead, it filed an action under § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U. S. C. § 185, in the United States District Court for the Northern District of Mississippi. The Company sought an injunction prohibiting arbitration of the grievances while the Company negotiated a conciliation agreement with the Commission. The Union counterclaimed to compel arbitration.

Before the District Court took any action, the Company and the Commission signed a conciliation agreement dated December 11, 1974. App. 10. In addition to ratifying the Company's position with respect to the shift preference dispute, the conciliation agreement provided that in the event of layoffs, the Company would maintain the existing proportion of women in the plant's bargaining unit. *Id.*, at 15–16. The Company then amended its § 301 complaint to add the Commission as a defendant and to request an injunction barring the arbitration of grievances seeking relief that conflicted with the terms of the conciliation agreement. The Commission cross-claimed against the Union and counterclaimed against the Company for a declaratory judgment that the conciliation agreement prevailed, or, in the alternative, for a declaratory judgment that the seniority provisions were not a

bona fide seniority system protected by § 703(h) of the Civil Rights Act, 78 Stat. 259, 42 U. S. C. § 2000e–2(h).[1]

While cross-motions for summary judgment were under consideration, the Company laid off employees pursuant to the conciliation agreement. Several men affected by the layoff, who would have been protected under the seniority provisions of the collective-bargaining agreement, filed grievances. In November 1975, with the Company still refusing to arbitrate, the District Court granted summary judgment for the Commission and the Company. It held that under Title VII the seniority provisions could be modified to alleviate the effects of past discrimination. *Southbridge Plastics Division, W. R. Grace & Co. v. Local 759,* 403 F. Supp. 1183, 1188 (1975). The court declared that the terms of the conciliation agreement were binding on all parties and that "all parties . . . shall abide thereby." App. 44.[2] The Union appealed, and no party sought a stay.

With the Union's appeal pending before the United States Court of Appeals for the Fifth Circuit, the Company, following the terms of the conciliation agreement, laid off more employees. Again, adversely affected male employees filed

---

[1] The Company's amended complaint, unlike the Commission's pleadings, did not expressly request a declaratory judgment under 28 U. S. C. §§ 2201 and 2202. See App. in *Southbridge Plastics Division, W. R. Grace & Co. v. Local 759,* No. 75–4416 (CA5), pp. 98, 123–124, 129–130. The United States Court of Appeals for the Fifth Circuit, however, viewed the Company's complaint as seeking a declaration of its obligations under the respective contracts. See 565 F. 2d 913, 915 (1978).

[2] The relevant text of the order is as follows:

"(1) The terms of the conciliation agreement executed on December 11, 1974, by the plaintiff and the defendant, EEOC, are binding upon all the parties to this action; and

"(2) Where the provisions of the collective bargaining agreement executed by the plaintiff and defendant, Local 759, conflict with the provisions of the conciliation agreement executed by the plaintiff and defendant, EEOC, the provisions of the conciliation agreement are controlling and all parties to this action shall abide thereby." App. 44.

grievances.　In January 1978, over two years after the District Court's decision, the Court of Appeals reversed. *Southbridge Plastics Division, W. R. Grace & Co.* v. *Local 759*, 565 F. 2d 913.　Applying *Teamsters* v. *United States*, 431 U. S. 324 (1977), which was decided after the District Court's decision, the Court of Appeals held that because the seniority system was not animated by a discriminatory purpose, it was lawful and could not be modified without the Union's consent.　565 F. 2d, at 916.　The court granted the Union's counterclaim, compelling the Company to arbitrate the grievances.

In response to this decision, the Company reinstated the male employees to the positions to which they were entitled under the collective-bargaining agreement.　The pending grievances, seeking backpay, then proceeded to arbitration. The first to reach arbitration was that of a male employee who had been demoted while the District Court order was in effect.　Arbitrator Anthony J. Sabella, in August 1978, concluded that although the grievant was entitled to an award under the collective-bargaining agreement, it would be inequitable to penalize the Company for conduct that complied with an outstanding court order.　App. 45.　He thus denied the grievance.　*Id.*, at 47.　Instead of filing an action to set aside that award, the Union chose to contest Sabella's reasoning in later arbitrations.

C

The next grievance to be arbitrated resulted in the award in dispute here.　*Id.*, at 48.　Arbitrator Gerald A. Barrett was presented with the complaints of two men who had been laid off before, and one man who had been laid off after, the entry of the District Court order.[3]　Acknowledging that the Sabella arbitration resolved the same contractual issue, *id.*,

---

[3] Neither the parties nor the District Court nor the Court of Appeals attached significance to this distinction between the grievants.　See Brief for EEOC as *Amicus Curiae* 6, n. 6.　Our resolution of the case eliminates any need to consider it.

at 51, Barrett first considered whether the collective-bargaining agreement required him to follow the Sabella arbitration award. He concluded that it did not. The collective-bargaining agreement limited the arbitrator's authority, Barrett found, to considering whether the express terms of the contract had been violated.[4] Because Sabella had considered the fairness of enforcing the terms of the contract, he had acted outside his contractually defined jurisdiction. *Id.*, at 55–56. Barrett determined that the finality clause of the collective-bargaining agreement[5] therefore did not require him to follow Sabella's award. *Ibid.*

Arbitrator Barrett then turned to the grievances before him. The Company did not dispute that it had violated the seniority provisions of the collective-bargaining agreement,[6] *id.*, at 56, and Barrett also accepted the Company's contention that it had acted in good faith in following the conciliation agreement. He found, however, that the collective-bargaining agreement made no exception for good-faith violations of the seniority provisions, and that the Company had acted at

---

[4] The 1974 collective-bargaining agreement and the succeeding 1977 agreement each defined the arbitrator's jurisdiction as follows:

"The jurisdiction and authority of the Arbitrator of the grievance and his opinion and award shall be confined exclusively to the interpretation and application of the express provision or provisions of this Agreement at issue between the Union and the Company. He shall have no authority to add to, adjust, change, or modify any provision of this Agreement." Art. IV, § 3; App. 19, 31.

[5] The finality clause in each of the 1974 and 1977 collective-bargaining agreements provided in relevant part: "The decision of the Arbitrator on the merits of any grievance adjudicated within his jurisdiction and authority as specified in this Agreement shall be final and binding on the aggrieved employee or employees, the Union and the Company." Art. IV, § 4; App. 20, 32.

[6] The 1974 and 1977 collective-bargaining agreements each provided: "If it is determined in the grievance procedure that an employee has been unjustly discharged or suspended the employee shall be reinstated to his former job and shall be compensated at his regular hourly earnings for the time lost less any penalty time decided upon." Art. IV, § 7(a); App. 21, 32–33.

its own risk in breaching the agreement. The Company, he held, could not complain that the law ultimately had made this out to be an unfortunate decision. *Ibid.* In essence, Barrett interpreted the collective-bargaining agreement as providing that the District Court's order did not extinguish the Company's liability for its breach.

## D

The Company then instituted another action under § 301 of the Labor Management Relations Act to overturn the award. The United States District Court for the Northern District of Mississippi entered summary judgment for the Company, finding that public policy prevented enforcement of the collective-bargaining agreement during the period prior to the Court of Appeals' reversal. App. 58–69. The United States Court of Appeals for the Fifth Circuit reversed. 652 F. 2d 1248 (1981). We granted certiorari to decide the important issue of federal labor law that the case presents. 458 U. S. 1105 (1982).

## II

The sole issue before the Court is whether the Barrett award should be enforced. Under well-established standards for the review of labor arbitration awards, a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one. *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 596 (1960). When the parties include an arbitration clause in their collective-bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by an arbitrator. Unless the arbitral decision does not "dra[w] its essence from the collective bargaining agreement," *id.*, at 597, a court is bound to enforce the award and is not entitled to review the merits of the contract dispute. This remains so even when the basis for the arbitrator's decision may be ambiguous. *Id.*, at 598.

Under this standard, the Court of Appeals was correct in enforcing the Barrett award, although it seems to us to have

taken a somewhat circuitous route to this result.[7]  Barrett's initial conclusion that he was not bound by the Sabella decision was based on his interpretation of the bargaining agreement's provisions defining the arbitrator's jurisdiction and his perceived obligation to give a prior award a preclusive effect.  See nn. 4 and 5, *supra*.  Because the authority of arbitrators is a subject of collective bargaining, just as is any other contractual provision, the scope of the arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrator.  Barrett's conclusions that Sabella acted outside his jurisdiction and that this deprived the Sabella award of precedential force under the contract draw their "essence" from the provisions of the collective-bargaining agreement.  Regardless of what our view might be of the correctness of Barrett's contractual interpretation, the Company and the Union bargained for that interpretation.  A federal court may not second-guess it.  *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S., at 599.

Barrett's analysis of the merits of the grievances is entitled to the same deference.  He found that the collective-bargaining agreement provided no good-faith defense to claims of violations of the seniority provisions, and gave him no authority to weigh in some other fashion the Company's good faith. Again, although conceivably we could reach a different result were we to interpret the contract ourselves,[8] we cannot say

---

[7] Although the court believed that the validity of the Sabella award was the dispositive issue, 652 F. 2d, at 1252, the Union raised and argued the question whether the Barrett award itself was enforceable.  Brief for Appellant in No. 80–3661 (CA5), pp. 18–30.  We disagree with the court's initial premise that the validity of the Sabella award is relevant.  Only the enforceability of the Barrett award is at issue.

[8] The 1974 and 1977 collective-bargaining agreements each contained a clause that provided: "In the event that any provision of this Agreement is found to be in conflict with any State or Federal Laws now existing or hereinafter enacted, it is agreed that such laws shall supersede the conflicting provisions without affecting the remainder of these provisions."  Art. XIV, § 7; App. 29, 42.  Before the Court of Appeals, the Company argued that under this "legality" clause the seniority provision was superseded by

that the award does not draw its essence from the collective-bargaining agreement.

### III

As with any contract, however, a court may not enforce a collective-bargaining agreement that is contrary to public policy. See *Hurd* v. *Hodge*, 334 U. S. 24, 34–35 (1948). Barrett's view of his own jurisdiction precluded his consideration of this question, and, in any event, the question of public policy is ultimately one for resolution by the courts. See *International Brotherhood of Teamsters* v. *Washington Employers, Inc.*, 557 F. 2d 1345, 1350 (CA9 1977); *Local 453* v. *Otis Elevator Co.*, 314 F. 2d 25, 29 (CA2), cert. denied, 373 U. S. 949 (1963); Kaden, Judges and Arbitrators: Observations on the Scope of Judicial Review, 80 Colum. L. Rev. 267, 287 (1980). If the contract as interpreted by Barrett violates some explicit public policy, we are obliged to refrain from enforcing it. *Hurd* v. *Hodge*, 334 U. S., at 35. Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Muschany* v. *United States*, 324 U. S. 49, 66 (1945).

### A

It is beyond question that obedience to judicial orders is an important public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn. *Walker* v. *City of Birmingham*, 388 U. S. 307, 313–314 (1967); *United States* v. *Mine Workers*, 330 U. S. 258, 293–294 (1947); *Howat* v. *Kansas*, 258 U. S. 181, 189–190 (1922). A contract provision the per-

---

the District Court's determination that the provision was illegal. The Court of Appeals responded that its decision reversing the District Court had retroactive effect because it declared the law as it always had existed. 652 F. 2d, at 1255. It seems to us, however, that the Company's argument was that the court should interpret the legality clause itself, a privilege not permitted to federal courts in reviewing an arbitral award.

formance of which has been enjoined is unenforceable. See Restatement (Second) of Contracts §§ 261, 264 (1981). Here, however, enforcement of the collective-bargaining agreement as interpreted by Barrett does not compromise this public policy.

Given the Company's desire to reduce its work force, it is undeniable that the Company was faced with a dilemma: it could follow the conciliation agreement as mandated by the District Court and risk liability under the collective-bargaining agreement, or it could follow the bargaining agreement and risk both a contempt citation and Title VII liability. The dilemma, however, was of the Company's own making. The Company committed itself voluntarily to two conflicting contractual obligations. When the Union attempted to enforce its contractual rights, the Company sought a judicial declaration of its respective obligations under the contracts. During the course of this litigation, before the legal rights were finally determined,[9] the Company again laid off employees and dishonored its contract with the Union. For these acts, the Company incurred liability for breach of contract. In effect, Barrett interpreted the collective-bargaining agreement to allocate to the Company the losses caused by the Company's decision to follow the District Court order that proved to be erroneous.[10]

---

[9] We do not decide whether some public policy would be violated by an arbitral award for a breach of seniority provisions ultimately found to be illegal under *Teamsters* v. *United States*, 431 U. S. 324, 355–356 (1977). Neither do we decide whether such an award could be enforced in the face of a valid judicial alteration of seniority provisions, pursuant to *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 778–779 (1976), to provide relief to discriminatees under Title VII or other law. See *Dennison* v. *City of Los Angeles Department of Water and Power*, 658 F. 2d 694, 695–696 (CA9 1981); *EEOC* v. *McCall Printing Corp.*, 633 F. 2d 1232, 1237 (CA6 1980).

[10] Although Barrett could have considered the District Court order to cause impossibility of performance and thus to be a defense to the Company's breach, he did not do so. Impossibility is a doctrine of contract in-

Even assuming that the District Court's order was a mandatory injunction,[11] nothing in the collective-bargaining agreement as interpreted by Barrett required the Company to violate that order. Barrett's award neither mandated layoffs[12] nor required that layoffs be conducted according to the

terpretation. See 18 W. Jaeger, Williston on Contracts §§ 1931–1979 (3d ed. 1978). For the reasons stated in the text, we cannot revise Barrett's implicit rejection of the impossibility defense. Even if we were to review the issue *de novo*, moreover, it is far from clear that the defense is available to the Company, whose own actions created the condition of impossibility. See *id.*, § 1939, p. 50; Uniform Commercial Code § 2–615(a) and Comment 10, 1A U. L. A. 335, 338 (1976); *Lowenschuss* v. *Kane*, 520 F. 2d 255, 265 (CA2 1975).

[11] As a threshold matter, we doubt that the District Court in this case ordered specific performance of the conciliation agreement or granted any other type of injunctive relief. That court, in "considering the declaratory relief sought," 403 F. Supp., at 1187, stated that the issue was "whether the terms of the conciliation agreement override the terms of the bargaining agreement." *Ibid.* Both the Company's amended complaint and the Union's counterclaim invoked only the cause of action provided by § 301 of the Labor Management Relations Act. Although the Commission filed a counterclaim against the Company alleging that the Company had violated Title VII, the Court of Appeals treated the case as a § 301 action. See 565 F. 2d, at 917. See generally *Airline Stewards & Stewardesses Assn.* v. *American Airlines, Inc.*, 573 F. 2d 960, 963 (CA7) (judicial review of Title VII settlement agreement is not review of judgment of Title VII liability after trial), cert. denied, 439 U. S. 876 (1978). Consistent with this view, the court expressly stated that the action was not brought under Title VII, 565 F. 2d, at 917, and refused to remand to permit individual women employees to meet the standards set forth in *Teamsters* v. *United States*, 431 U. S. 324 (1977). See 565 F. 2d, at 917. Thus, the courts had no occasion to order injunctive relief under Title VII. The decision of the District Court instead seems to be a declaration of the rights and obligations of the parties under the conflicting agreements, and not a mandatory injunction. Given the ambiguity, however, we assume for purposes of decision that the District Court's order constituted an injunction.

[12] Economic necessity is not recognized as a commercial impracticability defense to a breach-of-contract claim. Uniform Commercial Code § 2–615, Comment 4, 1A U. L. A. 336 (1976) (increased cost of performance does not constitute impossibility); 18 W. Jaeger, Williston on Contracts § 1931, pp. 7–8 (3d ed. 1978) (same). Thus, while it may have been economic mis-

collective-bargaining agreement. The award simply held, retrospectively, that the employees were entitled to damages for the prior breach of the seniority provisions.[13]

In this case, the Company actually complied with the District Court's order, and nothing we say here causes us to believe that it would disobey the order if presented with the same dilemma in the future. Enforcement of Barrett's award will not create intolerable incentives to disobey court orders. Courts have sufficient contempt powers to protect their injunctions, even if the injunctions are issued erroneously. See *Walker* v. *City of Birmingham*, 388 U. S., at 315. In addition to contempt sanctions, the Company here was faced with possible Title VII liability if it departed

---

fortune for the Company to postpone or forgo its layoff plans, its extant, conflicting, and voluntarily assumed contractual obligations exposed it to liability regardless of the layoff procedure it followed. In order to avoid liability under either contract, the Company, of course, could have accepted the economic losses of forgoing its reduction-in-force plans.

This is not to say that in the face of the economic necessity of the layoffs, the Company had no way whatsoever to avoid the injury. Prior to conducting the layoffs, the Company could have requested a stay from the District Court to permit it to follow the collective-bargaining agreement pending review by the Court of Appeals. It was the Company, which had sought the declaration of rights and obligations, and which chose to act before the determination of its respective contractual obligations was final; the Union most likely would have preferred that no layoffs occur at all. Although the Union could have requested a stay, there is no rule requiring a party to ask for prospective relief from a possible contractual breach. The Union justifiably relied on its right to backpay damages. Moreover, the Company, in future contract negotiations, may seek to bargain for a contract provision expressly allocating the loss to its employees in a case such as this one.

[13] Compensatory damages may be available to a plaintiff injured by a breach of contract even when specific performance of the contract would violate public policy. Restatement (Second) of Contracts § 365, Comment *a* (1981). This principle is particularly applicable here; since the employees' Union had no responsibility for the events giving rise to the injunction, and entered into the collective-bargaining agreement ignorant of any illegality, the employees are not precluded from recovery for the breach. *Id.*, § 180, Comment *a*.

from the conciliation agreement in conducting its layoffs. The Company was cornered by its own actions, and it cannot argue now that liability under the collective-bargaining agreement violates public policy.

Nor is placing the Company in this position with respect to the court order so unfair as to violate public policy. Obeying injunctions often is a costly affair.[14] Because of the Company's alleged prior discrimination against women, some readjustments and consequent losses were bound to occur. The issue is whether the Company or the Union members should bear the burden of those losses. As interpreted by Barrett, the collective-bargaining agreement placed this unavoidable burden on the Company. By entering into the conflicting conciliation agreement, by seeking a court order to excuse it from performing the collective-bargaining agreement, and by subsequently acting on its mistaken interpretation of its contractual obligations, the Company attempted to shift the loss to its male employees, who shared no responsibility for the sex discrimination. The Company voluntarily assumed its obligations under the collective-bargaining agreement and the arbitrators' interpretations of it. No public policy is violated by holding the Company to those obligations, which bar the Company's attempted reallocation of the burden.

## B

Voluntary compliance with Title VII also is an important public policy. Congress intended cooperation and con-

---

[14] A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond. *Russell* v. *Farley*, 105 U. S. 433, 437 (1882); *Buddy Systems, Inc.* v. *Exer-Genie, Inc.*, 545 F. 2d 1164, 1167–1168 (CA9 1976), cert. denied, 431 U. S. 903 (1977). Enforcing the Barrett award to compensate the injuries suffered by the male employees does not violate this principle. The only party injured by the injunction itself has been the Company; the proof of this is that if the Company had done nothing at all, see n. 12, *supra*, the economic loss from failing to reduce the work force would have fallen on the Company. By an independent and voluntary act, the Company shifted this loss to its male employees and thereby caused the injury remedied by the Barrett award.

ciliation to be the preferred means of enforcing Title VII. *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44 (1974). Critical to the compliance scheme is the Commission's role in settling Title VII disputes through conference, conciliation, and persuasion before a Title VII plaintiff or the Commission may bring suit. See § 706(b) of the Act, 42 U. S. C. § 2000e–5(b).

Enforcement of the Barrett award will not inappropriately affect this public policy. In this case, although the Company and the Commission agreed to nullify the collective-bargaining agreement's seniority provisions, the conciliation process did not include the Union. Absent a judicial determination, the Commission, not to mention the Company, cannot alter the collective-bargaining agreement without the Union's consent. See *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 44 (Commission's power to investigate and conciliate does not have coercive legal effect). Permitting such a result would undermine the federal labor policy that parties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored. *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502, 509 (1962). Although the ability to abrogate unilaterally the provisions of a collective-bargaining agreement might encourage an employer to conciliate with the Commission, the employer's added incentive to conciliate would be paid for with the union's contractual rights.

Aside from the legality of conferring such power on the Commission and an employer, it would be unlikely to further true conciliation between all interested parties. Although an innocent union might decide to join in Title VII conciliation efforts in order to protect its contractual position, neither the employer nor the Commission would have any incentive to make concessions to the union. The Commission and the employer would know that they could agree without the union's consent and that their agreement would be enforced.

In fact, enforcing the award here should encourage conciliation and true voluntary compliance with federal employment discrimination law. If, as in this case, only the employer

faces Title VII liability, the union may enter the conciliation process with the hope of obtaining concessions in exchange for helping the employer avoid a Title VII suit. If, however, both the union and the employer are potentially liable, it would be in their joint interests to work out a means to share the burdens imposed by the Commission's demands. On this view, the conciliation process of Title VII and the collective-bargaining process complement each other, rather than conflict.

## IV

For the foregoing reasons, the Barrett award is properly to be enforced. The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*