918 F.2d 21
 135 L.R.R.M. (BNA) 2979, 117 Lab.Cas. P 10,398
 NEWS AMERICA PUBLICATIONS, INC. DAILY RACING FORM DIVISION
v.
NEWARK TYPOGRAPHICAL UNION, LOCAL 103, (an unincorporated
association).
Appeal of NEWARK TYPOGRAPHICAL UNION, LOCAL 103.
 No. 90-5305.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 18, 1990.
Decided Oct. 31, 1990.
Rehearing and Rehearing In Banc Denied
Dec. 3, 1990.
 
 Richard S. Meyer (argued), Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellee.
 Richard Wysoker (argued), Wysoker, Glassner & Weingartner, P.A., New Brunswick, N.J., for appellant.
 Before HIGGINBOTHAM, Chief Judge, SCIRICA and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Chief Judge.
 
 
 1
 The District Court vacated a labor arbitration award concerning a dispute over a new economic package. It held that the arbitrator had exceeded his authority under the collective bargaining agreement. The union has appealed from the order of the District Court. Because this is not one of those rare cases in which the labor arbitration award fails to draw its essence from the collective bargaining agreement, we will vacate the judgment of the district court.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 In February of 1985, News America Publications, Inc., Daily Racing Form Division ("the Racing Form") entered into a collective bargaining agreement with Newark Typographical Union, Local 103 ("Typographical Union"). This agreement covered the period from November 1, 1983, through October 31, 1993. Section 36 of the agreement specified wage increases that became effective on November 1 of 1983, 1984, and 1985. After November 1, 1985, the following language in the agreement governed wage increases:
 
 
 3
 The contract may be reopened for wage adjustments by written notice of either party sixty (60) days prior to the November 1, 1986 anniversary of the contract, and on subsequent anniversary dates prior to contract expiration.
 
 
 4
 In the event the parties do not reopen the contract for wage adjustments, or are unable to reach agreement on wage adjustments, the following formula will apply:
 
 
 5
 The equivalent of any economic package granted by the DAILY RACING FORM to New York Mailers Union No. 6 or Newark Newspaper Printing Pressmen's Union No. 8 (whichever is greater) during the twelve months prior to November 1 of any year will be automatically granted to Newark Typographical Union members effective on November 1. Such economic package will be added to wages unless the parties mutually agree to divert some portion of the package to other purposes.
 
 
 6
 Appendix at 4a-5a.
 
 
 7
 As noted in the section quoted above, the Racing Form also had collective bargaining agreements with New York Mailers Union, Number 6 ("Mailers"), and the Newark Newspaper Printing Pressmen's Union, Number 8 ("Pressmen"). In 1983, when the Racing Form and the Typographical Union agreed upon Section 36, the Pressmen received increases in their economic benefits each year on April 26, while the Mailers, like the Typographical Union, received increases in their economic benefits each year on November 1.
 
 
 8
 Both the Pressmen and the Mailers negotiated a two part wage increase in 1986. First, they received a $25.00 increase in their weekly rate. Second, each union's wage increase was accelerated. Instead of receiving their wage increase on April 26, 1987, the Pressmen's increase was accelerated by five months to November 26, 1986. Similarly, the Mailers received their increase three months earlier, on August 1, 1987. Pursuant to Section 36 of the collective bargaining agreement, the Racing Form granted the Typographical Union a $25.00 increase effective August 1, 1987.
 
 
 9
 In 1988, the Pressmen and the Mailers received an increase of $27.50. This increase was made effective for the Pressmen on November 26, 1987, and for the Mailers on August 1, 1988. At a meeting held in February of 1988, the Racing Form presented the new wage package to the Typographical Union, and told the Typographical Union that the $27.50 increase would go into effect for them on November 1, 1988, not August 1, 1988. At this meeting, the Racing Form explained to the Typographical Union that it thought an error was made when the Typographical Union received the 1987 wage increase on August 1, 1987 instead of on November 1, 1987, but that in the interest of labor peace the Racing Form would not attempt to recover the accelerated 1987 wage increase from its employees. The Typographical Union filed a grievance over the Racing Form's position, contending that they were entitled to an economic package that was equivalent to that of the Mailers and Pressmen, but were denied that package because their benefits package was neither accelerated nor supplemented to reflect the new effective dates of the other two unions' increases.
 
 
 10
 The grievance was arbitrated on May 22, 1989, and an award in favor of the Typographical Union issued on July 7, 1989. The arbitrator framed the issue before him as follows: "Did the Company violate the collective bargaining agreement when it granted the Mailer Union's August 1, 1988 increase to Typographical Union # 103 effective November 1988 without retroactivity? If yes, what is the appropriate remedy?" In answering these questions, the arbitrator focused on the following phrase from Section 36: " 'the equivalent of any economic package granted by the Daily Racing Form to ... Mailers or Pressmen ... (whichever is greater) during the twelve months prior to November 1 of any year will be automatically granted to Newark Typographers Union members effective November 1.' "
 
 
 11
 The arbitrator determined that the "clear language ... was intended to maintain the economic status of the Graphic Display employees [Typographical Union] vis-a-vis the Pressmen and the Mailers." The rationale supporting this conclusion was that the phrase "equivalent of any economic package" included the economic value of benefits such as front-loading, rear-loading, "and other means of massaging the numbers." Accordingly, the arbitrator reasoned that in order for the Typographical Union members to receive the economic equivalent of the other unions' accelerated wage packages, the Typographical Union wage increase had to be supplemented. The arbitrator concluded that "[t]here are several methods to calculate the equivalence of the Mailers' $27.50 increase effective August 1, 1988. However, the simplest is to make the $27.50 increase effective November 1, 1988 retroactive to August 1, 1988."
 
 
 12
 On March 15, 1990, the District Court vacated the arbitration award. The court concluded that the arbitral award at issue ignored plain and unambiguous language in the labor agreement that mandated an effective date of November 1 for the Typographical Union increase: "The term 'effective November 1st' cannot plausibly be interpreted to mean August 1. Words mean what they mean and not what we want them to mean. November 1 means November 1." The court concluded that it should not enforce an award that ignored what the court thought to be Section 36's clear language. Second, the court disagreed with the arbitrator about the meaning of "equivalent economic package," and held that that term referred to "the bundle of wage and fringe benefits, not the date on which they become effective." In short, the District Court did not enforce the arbitration award because, in its view, the award changed the effective date of the wage increase from November 1 to August 1, a result that was beyond the authority of the arbitrator.
 
 
 13
 This appeal followed.
 
 
 14
 II. STANDARD FOR REVIEW OF A LABOR ARBITRATION AWARD
 
 
 15
 As Judge Aldisert has observed, federal labor law elevates labor arbitrators to "an exalted status." Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1126 (3d Cir.1969). Accordingly, courts play an extremely limited role in resolving labor disputes. See United Paperworkers International Union v. Misco, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). A court must enforce any arbitration award that " 'draws its essence from the collective bargaining agreement.' " Id. at 36, 108 S.Ct. at 370 (quoting United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). In reviewing an arbitral award, courts must recognize that the parties bargained for the arbitrator's construction of the agreement. See Enterprise Wheel, 363 U.S. at 599, 80 S.Ct. at 1362. A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract, see id., or because it believes its interpretation of the contract is better than that of the arbitrator. See W.R. Grace & Co. v. Local 759, International Union of the United Rubber Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983).
 
 
 16
 As long as the arbitrator has arguably construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that arbitrator has committed a serious error. Misco, 484 U.S. at 38, 108 S.Ct. at 371. This Court has held that there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award. See NF & M Corp. v. United Steelworkers of America, 524 F.2d 756, 760 (3d Cir.1975). Thus, only where there is a " 'manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.' " Id. at 759 (quoting Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir.1969)).
 
 
 17
 In this regard, a court may not review the merits of the arbitral decision. See Misco, 484 U.S. at 36, 108 S.Ct. at 370. A court does not review the award to ascertain whether the arbitrator has applied the correct principles of law. See Enterprise Wheel, 363 U.S. at 598, 80 S.Ct. at 1361. An arbitral award may not be overturned for factual error, see Misco, 484 U.S. at 38, 108 S.Ct. at 371, or because the court disagrees with the arbitrator's assessment of the credibility of witnesses, or the weight the arbitrator has given to testimony. See NF & M Corp., 524 F.2d at 759. It should be clear that the test used to probe the validity of a labor arbitrator's decision is a singularly undemanding one.
 
 III. APPLICATION OF THE STANDARD
 
 18
 The application of this standard in this case does not warrant an extended discussion. This arbitrator's award draws its essence from the collective bargaining agreement. It clearly addressed the two primary contractual limitations on the arbitrator's authority in the case before him: the effective date of the new benefits package, and the definition "equivalent economic package."[1] The arbitrator acknowledged that it would be beyond his authority to change the effective date of the Typographical Union's wage increase. The mere recognition of this contractual limitation is almost sufficient, in and of itself, for this Court to conclude that the arbitral award drew its essence from the agreement. The arbitrator, however, also made specific findings concerning the meaning of the phrase "equivalent economic package." The arbitrator specifically found that the intent of the parties in negotiating the language at issue was to maintain the economic position of the Typographical Union vis-a-vis the other two unions. Indeed, the only evidence on this point in the record is an affidavit submitted by the Typographical Union stating that the purpose of the clause was to "maintain parity (or the same relationship) with the other two unions...." The Racing Form put no evidence in the record concerning these parties' intent when they agreed to use the phrase "equivalent economic package."
 
 
 19
 We must accept the arbitrator's conclusion that the term "economic package" not only includes the wage increase, but also other means of "massaging the numbers," including an accelerated wage increase. In this regard, the reference to August 1, 1988 in the arbitral award was included because it appeared to the arbitrator to be the "simplest" way to calculate the equivalent of a three month acceleration in wages. The arbitrator's use of August 1 was a means to calculate an equivalent package, not an end in and of itself.
 
 
 20
 Even absent the evidence of record, we would still not be free to disregard the arbitrator's conclusion concerning the intent of the parties when they negotiated the contract language: "the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." Misco, 484 U.S. at 38. Therefore, we must accept as true the arbitrator's determination that the Typographical Union was "deeply concerned" about parity when it agreed to the terms of Section 36, and that the contract language reflects that concern.
 
 
 21
 The Typographical Union also asks this Court to award attorney's fees and prejudgment interest. There is no evidence in the record that these claims were presented to the District Court. The District Court did not address these issues in its letter opinion and order. The questions of attorney's fees and prejudgment interest will be remanded to the District Court for consideration in the first instance.
 
 IV. CONCLUSION
 
 22
 We conclude that the arbitration award draws its essence from the collective bargaining agreement. Accordingly, we will remand this case to the District Court with instructions to affirm the arbitration award of July 7, 1989, and to consider the Typographical Union's claim for attorney's fees.
 
 
 
 [1]
 We explicitly hold that a court need not conclude, as a prerequisite to finding that an arbitration award draws its essence from the collective bargaining agreement, that the arbitrator has addressed the contractual limitations on his or her authority