

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-1995

# United Transp v. Suburban Tran

Precedential or Non-Precedential:

Docket 94-5336

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"United Transp v. Suburban Tran" (1995). *1995 Decisions.* Paper 77.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/77

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 94-5336

————

UNITED TRANSPORTATION UNION LOCAL 1589


vs.

SUBURBAN TRANSIT CORP.


SUBURBAN TRANSIT CORP., a corporation of the
State of New Jersey

vs.

UNITED TRANSPORTATION UNION LOCAL 1589,
AFL-CIO

        United Transportation Union Local 1589,

                Appellant.


————


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil Nos. 93-cv-05728 and 93-cv-05769)

————


ARGUED DECEMBER 6, 1994

BEFORE:  STAPLETON, ROTH and LEWIS, Circuit Judges.

(Filed March 16, 1995)

————

Timothy R. Hott (ARGUED)
Hott & Margolis
591 Summit Avenue, Suite 300
Jersey City, NJ  07306

Attorney for Appellant


Francis A. Mastro (ARGUED)
Apruzzese, McDermott, Mastro & Murphy
25 Independence Boulevard
Post Office Box 112
Liberty Corner, NJ  07938

Attorney for Appellee

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

United Transportation Union, Local 1589, AFL-CIO (the "Union") appeals a district court order vacating an arbitration award in favor of Joseph Nagy, a former employee of Suburban Transit Corporation ("Suburban").  Because we agree with the Union that the district court failed to accord the arbitration award proper deference, we will reverse.

I.

A.

Suburban and the Union are parties to a collective bargaining agreement ("CBA").  Under the CBA, Suburban is given certain rights to discipline and discharge its employees, and the Union is entitled to contest any disciplinary action of management.  The parties agreed in the CBA to submit to arbitration any grievance that they cannot resolve.

More specifically, Article I, Section 5 of the CBA states that "[t]he Union recognizes the right of the Company to exercise all functions of management, including . . . the right to hire, promote, demote, transfer, and discipline or discharge for proper cause."  CBA, art. I § 5.  The same provision explains that "[t]he Union shall retain the right to contest any action of management in accordance with the appropriate provisions of this contract."  In Article IV, entitled "Discipline Procedure," the CBA sets forth eleven sections describing a variety of disciplinary procedures.  For most alleged infractions, an employee is entitled to a hearing before discipline is imposed.  However, in certain circumstances, Suburban has the right to suspend the employee immediately and then promptly hold a hearing.  In virtually all circumstances, an employee may appeal from his hearing to "the highest officer of Suburban" (CBA art. IV, § 3), and if the parties cannot resolve their differences even at this stage, "the dispute may be presented to an arbitrator selected through the rules of the American Arbitration Association or the N.J. State Board of Mediation . . . ."  Id.

art. V, § 1(d).  With respect to arbitration, the parties agree that "[t]he determination of th[e] arbitrator shall be final and binding on both parties" (id.), but the CBA also explains that the arbitrator's authority is not plenary;  rather,

> [a]uthority of the arbitrator shall be limited to the determination of the dispute or grievance arising out of the interpretation, application or operation of the provisions of this agreement on submission of the issues involved by the parties to this agreement.  He shall not have any authority whatsoever to alter, amend or modify any of the provisions of this agreement.

Id. art. V, § 3.

### B.

On December 15, 1992, Nagy was involved in a bus accident on the New Jersey Turnpike:  he rear-ended a tractor trailer because he was tailgating.  In his 12 years of employment, he had been involved in 24 accidents, nine of which were deemed preventable.  This was his third preventable rear-end collision.

Suburban fired Nagy, and the Union protested.  When the parties could not resolve their dispute, the matter was submitted to arbitration on the following questions:

Was the discharge of Joseph Nagy for just cause?

If not, what shall be the remedy?

After a hearing, the arbitrator ruled that Nagy was responsible for the accident, but that Suburban should not have fired him.  Instead, the arbitrator concluded, discharge was too harsh a sanction for a long term employee where the employee had

been afforded no opportunity to improve his driving skills through a retraining program.

Pursuant to 9 U.S.C. § 10(d), the Union and Suburban moved in the district court to enforce and vacate, respectively, the arbitrator's award. The district court, in a written opinion, denied the Union's motion to enforce and granted Suburban's motion to vacate the award, reasoning that the arbitrator had read into the CBA terms that were not there. The district court had jurisdiction under 29 U.S.C. § 185(a), and we have jurisdiction under 28 U.S.C. § 1291.

## II.

On appeal, the Union argues that because the arbitrator's award was at least arguably based on a construction of the CBA, the district court erred when it granted Suburban's motion to vacate the award. We agree.

## A.

District courts have very little authority to upset arbitrators' awards. As we explained in News America Publications, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21 (3d Cir. 1990), "courts play an extremely limited role in resolving labor disputes." Id. at 24. "A court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract . . . or because it believes its interpretation of the contract is better than that of the arbitrator." Id. (internal citation omitted). Rather, "[a]s long as the arbitrator has arguably construed or applied the contract, the award must be enforced, regardless of the fact that

a court is convinced that [the] arbitrator has committed a serious error." Id. Thus, "there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award." Id. "[O]nly where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." Id. (internal quotation omitted). Thus, as we wryly concluded, "[i]t should be clear that the test used to probe the validity of a labor arbitrator's decision is a singularly undemanding one." Id.

Although News America is notable for the thoroughness of its exposition, it is by no means the only source of our longstanding disinclination to allow district courts to overturn arbitration awards. To the contrary, our case law is uniform on this point. E.g., Roberts & Schaefer Co. v. Local 1846, UMW, 812 F.2d 883, 885 (3d Cir. 1987) ("[e]ven when the award was dubious, and the result one that we would not have reached had the matter been submitted to the court originally, we have upheld the arbitrator's decision"); United Indus. Workers v. Government of the Virgin Islands, 987 F.2d 162, 170 (3d Cir. 1993) (scope of review is "narrowly circumscribed"); Newark Morning Ledger Co. v. Newark Typographical Union, 797 F.2d 162, 165 (3d Cir. 1986) (our "strict standard means that a reviewing court will decline to sustain an award `only in the rarest case'"). As long as an arbitrator's decision arguably construes or "draws its essence" from the CBA, a district court is not permitted to vacate the

award. "An arbitration award draws its essence from the bargaining agreement if `the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention." Tanoma Min. Co., Inc. v. Local Union No. 1269, UMWA, 896 F.2d 745, 748 (3d Cir. 1990), quoting and adding emphasis to Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969). Only when an arbitrator "acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination," may a district court invade the province of the arbitrator. United Indus. Workers, 987 F.2d at 170.

The reason for such a lenient standard is not difficult to discern. "[F]requent judicial disapproval of the awards of labor arbitrators would tend to undermine a system of private ordering that is of the highest importance to the well-being of employer and worker alike." Newark Morning Ledger, 797 F.2d at 165.

### B.

With these considerations in mind, we turn to the district court's decision to vacate the arbitration award in this case. Although the district court recognized that it had limited authority to review in this case, the court nevertheless found that the arbitrator's award did not draw its essence from the CBA here because the arbitrator "read[] into" the CBA terms that were not there -- specifically, provisions dealing with retraining, progressive discipline, setting criteria for retraining, and

defining who is entitled to retraining.  This conclusion, however, was inaccurate.

Contrary to the district court's reasoning, the arbitrator did not impermissibly "read into" the parties' agreement terms that were not there.  Rather, the arbitrator simply interpreted the ambiguous term "proper cause" in a manner unsatisfactory to management.  The CBA allows Suburban to discipline or discharge for "proper cause" (art I, § 5), but does not define the phrase.  When the grievance was submitted to arbitration, the arbitrator was forced to decide what "proper cause" meant (or "just cause" according to the language of the questions submitted to arbitration, supra p. 4).  We cannot say that the arbitrator was engrafting provisions onto the CBA when he evidently decided that he must decide whether it was fitting (a synonym for "proper") and fair or equitable (two synonyms of "just," the term used in the actual submission to the arbitrator) for Suburban to have discharged a long-term employee for the accident in question.  In making this determination, the arbitrator wrote that although it was clear that Nagy had been negligent, what was not clear was the "validity of the punishment" imposed by Suburban.  He noted that although Nagy had been involved in many accidents, some were minor and occurred shortly after he was hired, and he had also received three annual safety awards.  The arbitrator also explained that Nagy had never been offered any retraining despite Suburban's recent decision to implement such a program.  This surprised and concerned the arbitrator because Nagy was a "veteran employee who has given

loyal service to his company for some twelve years."  Taking all of this into account, the arbitrator apparently determined that Suburban had proper cause to punish Nagy in some manner, but not to discharge him.  Thus, the arbitrator concluded that Nagy was properly punished through the suspension he had served, "it being understood that [Nagy] shall cooperate with management in undergoing a retraining program."

Suburban protests that this interpretation of the phrase "proper cause" imposed upon the company a "progressive discipline" system not bargained for by the parties.  The complete answer to this contention is that the parties bargained for contractual ambiguity instead of defining "proper cause" in the CBA.  Having decided not to define the phrase, Suburban cannot escape the results of that bargain simply because the arbitrator has chosen to interpret that phrase differently than Suburban may have wanted -- even if Suburban's interpretation of the CBA is more reasonable than the result announced by the arbitrator.  News America, 918 F.2d at 24 ("[i]n reviewing an arbitral award, courts must recognize that the parties bargained for the arbitrator's construction of the agreement"); Roberts & Schaefer Co. v. Local 1846, UMW, 812 F.2d 883, 885 (3d Cir. 1987) ("after bargaining for the decision of this arbitrator, the Company cannot avoid his decision merely because the arbitrator may have reached an incorrect result").  To the extent the arbitrator's award was based upon a theory that the parties intended "proper cause" to incorporate some form of progressive

discipline, that interpretation has some basis in the CBA.[1]  And
in any event, even if the arbitrator's interpretation of the
phrase "proper cause" did, in effect, impose a progressive
discipline system upon the parties, we have recognized that such
a result can be a justified interpretation of a "just cause"
provision.  See Arco-Polymers, Inc. v. Local 8-74, 671 F.2d 752
(3d Cir. 1982) ("`[i]n a proper case an arbitrator . . . may
construe a "just cause" provision of a labor contract to include
a progressive discipline requirement and may determine that
certain conduct is "just cause" for discipline but not for
discharge'" (quoting Mistletoe Express Service v. Motor
Expressmen's Union, 566 F.2d 692, 695 (10th Cir. 1977))).

In sum, that the arbitrator's interpretation of "proper
cause" was a legitimate reading of that phrase compels the
conclusion that the arbitrator's award both construed and drew

---

[1].    The CBA itself could be read to require differing gradations
of punishment based upon different degrees of culpability.  The
CBA discusses "minor infractions," which have less formal
adjudicative procedures, and more serious infractions, including
rear-end collisions, which trigger Suburban's right to
immediately suspend the driver, but which also trigger a driver's
right to a hearing if suspension is imposed.  See CBA art. IV,
§§ 5, 7, 8.  The procedures for resolving these more serious
infractions do not state that a driver must be fired if he is
found responsible for wrongdoing; in fact, the phrasing clearly
contemplates that suspension is a punishment short of -- and only
potentially leading to -- discharge.  See id. § 8.  Thus, the CBA
contemplates that some actions that may be cause for suspension
will not be cause for discharge, and the arbitrator did not
manifestly disregard the CBA in taking into consideration the
context in which the dispute arose (Nagy's conduct, his tenure,
his overall driving record, and Suburban's recent adoption of a
driver retraining program) in deciding Nagy's culpability and the
propriety of firing him, as opposed to merely suspending him.

its essence from the CBA.  That being the case, the district court had no grounds to vacate the award.

C.

Suburban urges that if we find that the district court erred in vacating the arbitration award, we should nevertheless affirm the district court on the ground that the award violates public policy.  Essentially, Suburban argues that public policy demands that common carriers provide safe carriage to their passengers, and that the arbitration award undermines this policy.  However, we decline Suburban's invitation to invalidate the award on public policy grounds.

Arbitration awards rendered pursuant to collective bargaining agreements can be vacated when such awards violate public policy.  W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983).  However, the public policy "must be well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"  Id. at 766, quoting Muschany v. United States, 324 U.S. 49, 66 (1945).  Although we have rejected the argument that an arbitration award may be set aside on public policy grounds only when it "violates positive law," we have stressed that a public policy must be "well defined and dominant" before it may be used to upset an arbitrator's award.  Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189, 1192, 1194 (3d Cir. 1993) (arbitration award vacated as against public policy when it required shipping company to reinstate able bodied seaman on oil tanker after seaman was found to be highly

intoxicated while on duty); see also Exxon Shipping Co. v. Exxon Seaman's Union, 993 F.2d 357 (3d Cir. 1993); Stroehmann Bakeries, Inc. v. Local 776, Int'l Brotherhood of Teamsters, 969 F.2d 1436 (3d Cir. 1992). In determining whether a public policy exists, federal courts must use common sense, keeping in mind that "a formulation of public policy based only on `general considerations of supposed public interests' is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective bargaining agreement." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 44 (1987).

We have addressed the public policy exception to enforcement of arbitration awards in light of W.R. Grace and Misco in two recent decisions discussed by the parties here: United States Postal Service v. National Assn of Letter Carriers, 839 F.2d 146 (3d Cir. 1988), and Service Employees Int'l Union Local 36 v. City Cleaning Company, Inc., 982 F.2d 89 (3d Cir. 1992). In Service Employees, we explained that "[t]he public policy exception" to the enforcement of arbitration awards "is slim indeed." Service Employees, 982 F.2d at 92. The exception is available only when "the arbitration decision and award create an explicit conflict with an explicit public policy . . .." Id. And in Letter Carriers, despite recognizing that customer and co-worker safety may be valid public policy, we determined that "a policy in favor of protecting co-workers and customers from [an employee's] violent conduct (assuming, arguendo, that such a

policy is properly ascertained) does not <u>require</u> his discharge for its fulfillment."  <u>Letter Carriers</u>, 839 F.2d at 149-50.[2]

We acknowledge that public transportation safety is a valid public concern, but Suburban has failed to demonstrate that public policy requires vacation of the arbitrator's award here. Suburban has not provided us with "laws and legal precedents" which describe an "explicit" public policy; rather, what Suburban has described as putative public policy is more akin to the amorphous "public interests" that were deemed insufficient to articulate public policy in <u>W.R. Grace</u>.[3]  Furthermore, even if we

[2].        In three recent cases not discussed by the parties, we found that arbitrators' awards should be vacated on public policy grounds.  <u>See</u> <u>Exxon Shipping Co. v. Exxon Seamen's Union</u>, 11 F.3d 1189 (3d Cir. 1993) (<u>Exxon Shipping II</u>); <u>Exxon Shipping Co. v. Exxon Seaman's Union</u>, 993 F.2d 357 (3d Cir. 1993) (<u>Exxon Shipping I</u>); <u>Stroehmann Bakeries, Inc. v. Local 776, Int'l Brotherhood of Teamsters</u>, 969 F.2d 1436 (3d Cir. 1992).  In each of those cases, however, the public policy was much more explicit and the conflict between it and the particular award much more pronounced than is the case here.

[3].    In an effort to demonstrate that the arbitrator's award would conflict with explicit public policy, Suburban cites 49 C.F.R. § 391.25, a Department of Transportation regulation requiring motor carriers to review annually their drivers' records to ascertain whether any of their drivers are disqualified to drive a motor vehicle under 49 C.F.R. § 391.15. Suburban cannot contend that the arbitrator's award prevents the company from making its annual review under § 391.25, however, nor can it suggest that the award forces the company to keep Nagy on the road in violation of § 391.15.  Section 391.15 disqualifies a driver in only two circumstances:  (1) if the driver loses his or her driving privileges, as discussed in § 391.15(b); or (2) if the driver commits certain "criminal [or] other offenses" as detailed in § 391.15(c).  Furthermore, citation to section 391.25 demonstrates that any "public policy" in favor of driver safety is much more lenient than Suburban would have it.  Only in egregious cases do federal regulations disqualify drivers.  Neither condition appears to have been met in Nagy's case.

found that Suburban had articulated a public policy which could, in some cases, undermine an arbitration award, we still would not vacate the award here. Suburban simply has not shown that the arbitrator's award in this case would explicitly conflict with the public policy championed by the company. Nagy has obviously had many accidents, but he has also won a number of safety awards. Additionally, the arbitrator's award seeks to encourage driver retraining; thus, it seems that the arbitrator had an eye toward public safety when he rendered his decision. Therefore, Suburban's public policy argument fails to persuade us that the arbitrator's award must be vacated.

## III.

For the foregoing reasons, we will reverse and remand with instructions to confirm the arbitration award.