196 F.3d 117 (2nd Cir. 1999)
 LOCAL 97, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, A.F.L.-C.I.O., Plaintiff-Counter-Defendant-Appellant,
v.
NIAGARA MOHAWK POWER CORPORATION, Defendant-Counter-Claimant-Appellee.
 No. 98-7138
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 June 1, 1999, Argued
August 18, 1999, Decided
As Amended October 28, 1999.
 
 [Copyrighted Material Omitted]
 D. JEFFREY GOSCH, Syracuse, NY, for Appellant.
 ROBERT W. KOPP, Syracuse, NY (David M. Pellow, Bond, Schoeneck & King, Syracuse, NY, of counsel), for Appellee.
 Before: MESKILL and WALKER, Circuit Judges, and TRAGER, District Judge.*
 MESKILL, Circuit Judge:
 
 
 1
 Plaintiff-counter-defendant-appellant International Brotherhood of Electrical Workers, Local 97, A.F.L.-C.I.O. filed suit to confirm an arbitration award directing defendant-counter-claimant-appellee Niagara Mohawk Power Corporation to reinstate a previously discharged employee. After the parties cross-moved for summary judgment, the United States District Court for the Northern District of New York, Munson J., granted judgment in defendant's favor and vacated the award, on the ground that enforcement of the award would violate public policy. Local 97, Int'l Brotherhood of Elec. Workers v. Niagara Mohawk Power Corp., 1997 U.S. Dist. 1997 WL 793137 (N.D.N.Y. Dec. 16, 1997). Plaintiff now appeals. Because we cannot conclude that reinstating the employee would violate clearly defined public policy, we vacate the judgment and remand to the district court with instructions to confirm the arbitration award.
 
 BACKGROUND
 I. Factual Background
 
 2
 Niagara Mohawk Power Corporation (Company) is a public utility licensed by the United States Nuclear Regulatory Commission (NRC) to operate two nuclear generating plants in New York state, located at Nine Mile Point in Lycoming, New York. The Company is engaged in the business of supplying and generating natural gas and electrical power to commercial, residential and industrial consumers throughout upstate New York. The Company is an employer "in an industry affecting commerce" within the meaning of the Labor-Management Relations Act of 1947 (LMRA), 29 U.S.C. 185(a).
 
 
 3
 The International Brotherhood of Electrical Workers, Local 97 (Union) is the only duly recognized collective bargaining agent for employees of the Company. The Union represents non-management employees in clerical, technical, production and maintenance job classifications, and is a "labor organization" under the LMRA. The Union and the Company have been parties to a series of collective bargaining agreements (CBA) which govern the hours, wages and working conditions of those employees represented by the Union. The CBA relevant to this litigation was in effect from June 1, 1993 to February 29, 1996.
 
 
 4
 The CBA limits the Company's ability to discipline its represented employees and makes any such discipline subject to an agreed on grievance procedure. In particular, the CBA provides that employees may be terminated only for "just cause," and that wrongfully discharged employees should be reinstated and compensated at the basic rate for all time lost.[1] The grievance procedure provides for arbitration of unresolved disputes before a tripartite panel. According to the CPA, the decision of the arbitration panel is final and binding upon the parties.
 
 
 5
 The Company, as a licensed nuclear power plant operator, is subject to regulations promulgated by the NRC, many of which are concerned with insuring the reliability of the human resources used to operate and safeguard the structures and components that generate nuclear power. Among those regulations is 10 C.F.R. 73.56, which requires a licensee to incorporate an "access authorization plan" into its Physical Security Plan. This access authorization plan must ensure that "individuals granted unescorted access are trustworthy and reliable" and "do not constitute an unreasonable risk to the health and safety of the public." 10 C.F.R. 73.56(b)(1). A licensee's decision to grant or withhold access must be based on "review and evaluation of all pertinent information developed." Id. 73.56(b)(3).
 
 
 6
 Prior to his February 4, 1994 discharge, Michael O'Hearn (O'Hearn) had been employed as a Nuclear Security Officer at the Nine Mile nuclear facility for eight and one-half years and was subject to all requirements set by the NRC. In his capacity as a security officer, O'Hearn was responsible for monitoring certain of the nuclear facility's alarm systems, enforcing the facility's various security rules and regulations and responding to any active alarms. All Nuclear Security Officers, such as O'Hearn, receive NRC-mandated training in connection with the various internal security systems of the facility. At the Nine Mile facility the NRC-mandated alarm system consists of a Central (CAS) and Secondary (SAS) alarm systems. There is also a non-NRC-mandated alarm system known as the Central Alarm Receiving Station (CARS), which monitors two buildings, neither of which is within the actual nuclear plant container. When an alarm sounds, the signal is sent to a monitor, which is watched over by a security officer, who then is required to contact the fire department and follow any other instructions that are shown on the monitor.
 
 
 7
 While working the late shift on January 16, 1994, O'Hearn was assigned to alarm station/escort duties, which included working in the SAS, the backup system to the CAS. O'Hearn reported to the SAS at approximately 3:00 a.m. At 3:16 a.m., a fire alarm sounded in the CARS area which O'Hearn promptly silenced. He failed to follow directions on the CARS console, however, and did not contact any of the listed response personnel.
 
 
 8
 About one hour later, at approximately 4:15 a.m., another Nuclear Security Officer on patrol noticed strobe lights flashing in the Operations Building. He informed a supervisor that the alarm was sounding and that there were no response personnel at the scene. When the supervisor contacted O'Hearn and asked him if he was aware of an alarm, O'Hearn told him that "[a] trouble alarm just came in." When asked, O'Hearn told the supervisor that he had attempted to contact the fire department, but that he had been unable to speak with anyone. The supervisor then instructed O'Hearn to call Nine Mile Point's control room so that the personnel on duty could radio the fire department. Soon after the fire department arrived at the Operations Building they discovered that the CARS alarm had been triggered by a broken sprinkler head. As a result of this malfunction, the building was partially flooded.
 
 
 9
 The next day, the Company began an investigation into the incident. During an interview with the Company's General Supervisor for Nuclear Security Operations, O'Hearn untruthfully stated that there was only a "momentary delay" from the time the alarm sounded to when he called the control room; O'Hearn also stated that the delay occurred because he received no answer when he tried to contact the fire department. On January 17, 1994, on the advice of his supervisor, O'Hearn wrote a memorandum, setting forth his version of the events that took place the day before. In that memorandum, O'Hearn misrepresented that the alarm had sounded at 4:15 a.m. He also stated that he notified the supervisor of the alarm and that he did not make any attempt to contact the fire department until after he had notified his supervisor.
 
 
 10
 Although the Security Department initially did not suspect that anything was amiss with respect to O'Hearn's conduct, the significant amount of water damage in the Operations Building suggested that a longer amount of time had elapsed between when the alarm came in and when O'Hearn reported it to the fire department. This prompted the fire department to check the computer printout from the Operation Building's fire system to determine the exact time the alarm had been transmitted to the SAS. The printout revealed that the alarm had sounded at 3:16 a.m., one hour before O'Hearn had represented it had sounded. As a result of this new information, the Nuclear Security Department continued its investigation and interviewed individuals involved with the incident. O'Hearn was interviewed on January 27, 1994, at which time he admitted that the delay between when the alarm sounded and when he reported it could have been as long as forty-five minutes and also admitted that he did not attempt to contact the fire department or the control room until he was instructed to do so by his supervisor.
 
 
 11
 On February 4, 1994, during a disciplinary meeting held pursuant to Article XVI of the CBA, the Company informed O'Hearn that his employment was terminated because their investigation revealed that he had failed to respond properly to the security alarm and that he knowingly and willfully provided false information to his supervisors and to the Nuclear Security Investigators throughout the investigation. O'Hearn, accompanied by his Union representative, was given the opportunity at the meeting to respond to these findings, but failed to do so. On February 7, 1994, the Union filed a grievance challenging the decision to discharge O'Hearn. The grievance was not resolved and the matter was submitted to arbitration.
 
 
 12
 The Company and the Union waived their rights to a tripartite panel and mutually agreed on a neutral arbitrator (Arbitrator) to hear the matter. Arbitration hearings were held in Syracuse, New York on September 13, November 1, and December 12, 1995, and the Arbitrator delivered his decision and award (Award) on March 1, 1996. In sum, the Award concluded that O'Hearn had not engaged in gross negligence as alleged by the Company and that, although he was untruthful with regard to this incident, his behavior did not constitute just cause for dismissal. The Award reinstated O'Hearn and instructed that he receive back pay for the balance of his period of termination.
 
 
 13
 The Company refused to honor the Award and on May 7, 1996 the Union filed suit in the United States District Court for the Northern District of New York to confirm the Award under Section 301 of the LMRA, 29 U.S.C. 185.[2] The Company counterclaimed to vacate the Award on the ground that it violated public policy. The district court granted the Company's motion for summary judgment, concluding that the Award violated public policy because it required the Company to grant unescorted access to an individual who was not "trustworthy" or "reliable" within the meaning of NRC regulations. This appeal followed.
 
 II. Prior Proceedings
 A. Arbitration Proceedings and Decision
 
 14
 The parties agreed that the Arbitrator would decide the following issue: "Was there just cause for the discharge of the grievant Michael O'Hearn? If not, what shall be the remedy?"
 
 
 15
 In the decision accompanying his Award, the Arbitrator first decided that it was the Company's burden to prove, by clear and convincing evidence, that O'Hearn was discharged for "just cause." According to the Arbitrator, determining just cause entails a two-step inquiry: "first, whether the evidence supports the Employer's conclusion that a disciplinary offense was committed; and second, if so, whether the penalty imposed was appropriate and justified by the gravity of the offense."
 
 
 16
 The Company argued that O'Hearn's discharge was justified not only because he had failed to respond to the alarm (a failure that led to substantial property damage), but also because he lied repeatedly about the incident throughout the ensuing investigation. Because, the Company maintained, O'Hearn's dishonesty established that he was not "trustworthy" or "reliable," his further employment would run contrary to NRC regulations that required the Company to provide "high assurance" that employees in O'Hearn's position were both "trustworthy" and "reliable" individuals. In sum, the Company argued that O'Hearn's conduct amounted to "gross negligence," which was more than adequate to justify termination.
 
 
 17
 In response, the Union argued that the Company lacked just cause for the termination. Advancing multiple arguments, the Union maintained that O'Hearn had, in fact, performed his job properly; that the Company had not sustained any damage as a result of the sprinkler having gone off; that any property damage that did occur was caused by the faulty sprinkler, not by O'Hearn; that, in any event, discharge was a disproportionately harsh penalty because at most O'Hearn was careless but not grossly negligent; and that any disciplinary decision must account for O'Hearn's prior eight and one-half years of unblemished service to the Company.
 
 
 18
 The Arbitrator found for the Union, but not before concluding that O'Hearn had indeed lied to cover up the incident. The Arbitrator's conclusions on this score were clear, as he noted that O'Hearn "lost his credibility and integrity" on account of his testimony; that O'Hearn is a "perpetually untruthful person . . . whose testimony changes like the ocean tide;" and that there were a "litany of untruthful statements by O'Hearn during these proceedings" that were "far too many to list." In his summary findings, the Arbitrator conceded that the Company's "argument that O'Hearn was untruthful are [sic] sound and correct."
 
 
 19
 Nonetheless, the Arbitrator concluded that the Company had failed to establish "just cause" for the discharge. First, rejecting the Company's argument that O'Hearn was guilty of "gross negligence" sufficient to justify discharge, the Arbitrator found that in failing to respond to the monitor O'Hearn had been "careless and negligent" but not "grossly negligent." Although noting that termination might be appropriate "where the employee is guilty of a single flagrant willful act or one act of 'gross negligence,'" the Arbitrator reflected that "generally speaking, one act of negligence or carelessness is not grounds for an employee's discharge." Reasoning that "negligence . . . is a disciplinary offense, but not a discharge under these circumstances," the Arbitrator found that O'Hearn should not have been fired because "there was no evidence to suggest" that he had engaged in "a malicious or evil act."
 
 
 20
 Furthermore, noting that "it is not unusual for an Arbitrator to consider an employee's past record," the Arbitrator concluded that O'Hearn's unblemished record during his previous eight and one-half years of service was additional evidence that discharge was inappropriate.
 
 
 21
 Ultimately, the Arbitrator concluded that the penalty was "rightly disproportionate to the offense" and was "too severe under guidelines of 'progressive discipline,'" which contemplate that warnings and suspension should precede discharge. Accordingly, the Arbitrator ordered O'Hearn's reinstatement with 17 months' back pay, and indicated that his record should reflect a 30 day suspension for his carelessness in response to the alarm and for his untruthfulness during the ensuing investigation.
 
 B. District Court Decision
 
 22
 In December 1997 the district court issued a memorandum decision and order resolving the cross summary judgment motions in the company's favor. See 1997 WL 793137, at *7. Although acknowledging that, "absent exceptional circumstances, a court cannot reconsider an arbitration award -- even if it would have decided the matter differently," id. at *4, the district court concluded that to confirm the Award would violate public policy; as a result, the district court granted the Company's motion for summary judgment, vacated the Award, and dismissed the case.
 
 
 23
 The district court reasoned that enforcement of the Award would run contrary to the "dominant and well-defined public policy requiring strict adherence to the nuclear safety rules," id at *5, particularly the regulation requiring licensees to provide "high assurance" that employees who have unrestricted access to nuclear facilities are "trustworthy and reliable" and do not pose an "unreasonable risk to the health and safety of the public," see id. (citing 10 C.F.R. 73.56).[3] According to the district court, because the Arbitrator's findings established that "it is dubious whether O'Hearn is reliable" and that "it is certain he is not trustworthy," see id. at *6, O'Hearn's reinstatement would violate the public policy requiring strict compliance with 10 C.F.R. 73.56, i.e., reinstatement would impermissibly require the Company to employ an individual who demonstrably was neither "trustworthy" nor "reliable" and who would pose an unreasonable risk to the health and safety of the public. Concluding that O'Hearn's "dishonesty cannot be countenanced," the district court vacated the award as contrary to public policy.[4]
 
 
 24
 The district court was well aware of the extraordinary nature of the relief it granted, clarifying that its holding was "limited to the facts at hand," "should not be seen as undermining the decidedly valuable role of arbitration," and "'should not be read as a blanket justification for the discharge of every employee who breaches a public safety regulation at a nuclear power plant.'" Id. at *7 (quoting Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Brotherhood of Elec. Workers, 834 F.2d 1424, 1429 (8th Cir. 1987)). Rather, the district court conceded that "there can be instances where a breach of a public safety regulation should not lead to an employee's termination." Id.
 
 DISCUSSION
 I. Review of Arbitration Awards Generally
 
 25
 "We review a district court decision upholding or vacating an arbitration award de novo on questions of law and for clearly erroneous findings of fact." Wackenhut Corp. v. Amalgamated Local 515, 126 F.3d 29, 31 (2d Cir. 1997). As is standard practice in agreements between a union and a company, the parties in this case agreed to have their disputes settled by a neutral arbitrator and to accept the arbitrator's findings of fact and interpretation of their contract. Alternative dispute resolution of this kind fulfills the intent of the LMRA, which established "a clear preference for the private resolution of labor disputes without government intervention." Int'l Brotherhood of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp., 143 F.3d 704, 714 (2d Cir. 1998) (Niagara Mohawk I).
 
 
 26
 Because "the federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of [arbitration] awards," United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 4 L. Ed. 2d 1424, 80 S. Ct. 1358 (1960), an arbitrator's award resolving a labor dispute "is legitimate and enforceable as long as it 'draws its essence from the collective bargaining agreement' and is not merely an exercise of the arbitrator's 'own brand of industrial justice.'" Niagara Mohawk I, 143 F.3d at 714 (quoting Enterprise Wheel, 363 U.S. at 597). Accordingly, the Supreme Court has made clear that a reviewing court is bound by the arbitrator's factual findings, interpretation of the contract and suggested remedies. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37-38, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987). Generally speaking, unless the award is procured through fraud or dishonesty, the decision should not be disturbed. Id. at 38.
 
 
 27
 The result is that the "contractual theory of arbitration . . . requires a reviewing court to affirm an award it views as incorrect -- even very incorrect -- so long as the decision is plausibly grounded in the parties' agreement." Wackenhut, 126 F.3d at 32; Saint Mary Home v. Service Employees Int'l Union, Dist. 1199, 116 F.3d 41, 44 (2d Cir. 1997). Thus, parties that have agreed to submit their disputes to arbitration must accept the arbitrator's view of the facts and interpretation of the contract. See Misco, 484 U.S. at 38.
 
 
 28
 II. The "Public Policy Exception"
 
 
 29
 Although courts accord nearly total deference to arbitral decisions, a court "may not enforce a collective-bargaining agreement that is contrary to public policy." W. R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766, 76 L. Ed. 2d 298, 103 S. Ct. 2177 (1983). This so-called "public policy exception" is extremely limited, and the party seeking the benefit of the exception must establish its existence. Cf. Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp. 103 F.3d 9, 12 (2d Cir. 1997) (noting that "party moving to vacate [an arbitration] award has the burden of proof"). A court may vacate an arbitral award on public policy grounds only if it can "demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator." Niagara Mohawk I, 143 F.3d at 716 (quoting Stead Motors v. Automotive Machinists Lodge No. 1173, 886 F.2d 1200, 1212-13 (9th Cir. 1989) (in banc)). "Public policy," in this context, "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" W. R. Grace, 461 U.S. at 766 (quoting Muschany v. United States, 324 U.S. 49, 66, 89 L. Ed. 744, 65 S. Ct. 442 (1945)).
 
 
 30
 While the question of whether enforcement of an award would violate public policy "is ultimately one for resolution by the courts," id., authority to answer that question does not afford courts "authority to disagree with [the arbitrator's] honest judgment" about the proper remedy to be awarded in a given case. Misco, 484 U.S. at 38. To the contrary, the court must determine "whether the award itself, as contrasted with the reasoning that underlies the award, 'creates [an] explicit conflict with other laws and legal precedents' and thus clearly violates an identifiable public policy." Niagara Mohawk I, 143 F.3d at 716 (quoting Misco, 484 U.S. at 43 (quoting W. R. Grace, 461 U.S. at 766)) (alterations in Niagara Mohawk I).
 
 
 31
 In Niagara Mohawk I, decided after the district court issued its opinion in this case,[5] we attempted to identify the limits of the public policy exception in the context of nuclear safety regulations. There, an employee, Rando, adulterated a urine sample to circumvent Niagara Mohawk's NRC-mandated drug testing policy. Niagara Mohawk terminated Rando and the matter was submitted to an arbitration panel that awarded the employee conditional reinstatement premised on his compliance with rehabilitative programs and future negative testing.
 
 
 32
 As in this case, Niagara Mohawk refused to reinstate the employee and the Union brought an action in the district court to confirm the award. Niagara Mohawk argued, as it does in this case, that reinstatement of the employee would offend public policy of ensuring strict compliance with nuclear safety rules, in particular by rendering the Company in violation of the "trustworthy and reliable" requirement found at 10 C.F.R. 73.56. The district court agreed and vacated the award, finding that the employee's adulteration of the sample rendered him "untrustworthy" within the meaning of the NRC regulations. Int'l Brotherhood of Electrical Workers, Local 97 v. Niagara Mohawk Power Corp., 950 F. Supp. 1227, 1236 (N.D.N.Y. 1996), rev'd, 143 F.3d 704 (2d Cir. 1998).
 
 
 33
 We reversed. 143 F.3d 704. We attempted to reconcile the "deference that must be accorded an arbitrator's judgment" with the "substantial public interest in nuclear safety." Id. at 717. To this end, we acknowledged the important safety issues involved in security at a nuclear power plant but remained cognizant of the narrow scope of review that courts employ when reviewing arbitral awards. We thus stated that "in determining whether an arbitral award which orders reinstatement of an employee previously discharged from a nuclear power plant violates public policy, the issue should be whether the reinstatement itself specifically contravenes a 'well defined and dominant public policy. '" Id. (quoting Misco, 484 U.S. at 44).
 
 
 34
 Noting that the question reduces to whether the employee's actions "rendered him an inherently untrustworthy person within the meaning of the NRC regulations when read as a whole," id. at 720, we observed that the public policy that mandated drug testing of nuclear plant employees also stressed the value of rehabilitation. In particular, the NRC regulations left punishment for first time drug offenses to the discretion of the employer, as long as the punishment imposed involved at least a two week denial of unescorted access and referral to a rehabilitative program. See id. at 709. Because there was evidence that the NRC drug testing regulations extended their rehabilitative approach to employees who acted to conceal their drug use, we were unable to say with certainty that conditional reinstatement of an employee who, like Rando, had adulterated a drug test specimen in order to conceal drug use and then lied when first confronted about that drug use would pose an "explicit conflict" with the public policy promoting nuclear safety. Id. at 722. Because the arbitrator's findings -- to which the district court was bound -- did not permit an "unequivocal showing" that reinstatement would violate clearly defined and well articulated public policy, we were constrained to let the award stand. Id. at 721.
 
 
 35
 The principles articulated in Niagara Mohawk I -- a case decided after the district court rendered its decision in this case -- dictate the result here.
 
 
 36
 III. Public Policy Does Not Specifically Militate Against the Relief Ordered by the Arbitrator
 
 
 37
 O'Hearn's behavior in this case was reprehensible. Nevertheless, the principles articulated in Niagara Mohawk I and the precedents drawn upon therein compel us to vacate the district court's judgment and direct enforcement of the Award. We reach this result because we cannot conclude unequivocally that the reinstatement Award necessarily violates clearly defined public policy of ensuring adherence to nuclear safety regulations.
 
 
 38
 In defending this appeal, the Company argues that O'Hearn's reinstatement would render the Company in violation of NRC regulation 10 C.F.R. 73.56, which mandates that individuals granted unescorted access to nuclear facilities be both "trustworthy" and "reliable." The Company maintains that the Arbitrator's statements impugning O'Hearn's credibility establish conclusively that O'Hearn is neither "trustworthy" nor "reliable" within the meaning of the NRC regulations. Accordingly, the Company maintains, it would automatically run afoul of 10 C.F.R. 73.56, and hence violate public policy, if it complied with the Award and reinstated O'Hearn.
 
 
 39
 We note at the outset that although the Company insists O'Hearn's misdeeds were so serious that the public policy in nuclear safety mandates his dismissal, there is no indication that the Company has ever brought O'Hearn's conduct to the attention of the NRC, the regulatory body charged with enforcing nuclear safety regulations. This may suggest that the Company assumed that the Arbitrator would decide in its favor. But the propriety of O'Hearn's discharge is a matter that the Company agreed to submit to binding arbitration; the Company is bound by the outcome of that bargained-for process. See Local 453, Int'l Union of Elec. Workers v. Otis Elevator, 314 F.2d 25, 28 (2d Cir. 1963) ("Having bargained for the decision of the arbitrator on the question of whether [the employee's] conduct . . . constituted 'just cause' for discharge, the parties are bound by it, even if it be regarded as unwise or wrong on the merits.").
 
 
 40
 Now the Company is asking the courts to overturn the Arbitrator's Award on public policy grounds. The Company chose not to notify the NRC of O'Hearn's wrongdoing; perhaps, if it had, the Company might have received clear guidance as to the degree to which his wrongdoing offends public policy in nuclear safety compliance. In this context, however, we must fulfill our duty to ascertain public policy as a matter of law, "by reference to . . . laws and legal precedents." W. R. Grace, 461 U.S. at 766 (noting that "the question of public policy is ultimately one for resolution by the courts"). As explained below, we look to the NRC's pronouncements and actions for guidance. However, the requirement that nuclear power plant employees be "trustworthy" and "reliable," 10 C.F.R. 73.46, by itself is too general a standard to justify the reversal of an arbitrator's reinstatement award based on public policy grounds; it impermissibly invites a reviewing court to subjectively determine "public policy" from "general considerations of supposed public interests," in contravention of the Court's holding in W. R. Grace. We must look to more specific NRC regulations and enforcement actions to discern what public policy requires in the nuclear safety context. After examining that body of authority, we cannot conclude that O'Hearn's reinstatement unequivocally violates public policy.
 
 A. The NRC's Enforcement Policy
 
 41
 In Niagara Mohawk I, we declared that "public policy" in the context of nuclear safety is defined by the NRC's regulations. 143 F.3d at 706. Here, as in Niagara Mohawk I, the Company points to no materials outside of those regulations that might elucidate the contours of the relevant public policy; thus, as in Niagara Mohawk I, the NRC regulations comprise "the prime source" and the "most persuasive evidence" of public policy in this case and will guide our analysis. Id. at 718, 722. The NRC's enforcement policy provides the strongest indication of the contours of the public policy implicated in this case. As explained below, that policy and the NRC's enforcement decisions in a variety of cases indicate a degree of flexibility within the regulatory scheme and suggest that not all violations necessarily render an individual unqualified for employment under 10 C.F.R. 73.56.
 
 
 42
 The NRC has set forth a specific policy to guide its enforcement program, which supports its "safety mission in protecting the public and the environment." See General Statement of Policy and Procedure for NRC Enforcement Actions, 63 Fed. Reg. 26,630 at 26,633 (1998). Acknowledging that violations of nuclear safety requirements "have varying degrees of safety . . . significance," the NRC categorizes violations into four levels of relative severity. "Severity Level I," which applies to the "most significant" violations, is reserved for violations that are of "very significant regulatory concern and which "involve actual or high potential impact on the public." 63 Fed. Reg. at 26634. "Severity Level IV," in contrast, applies to the "least significant" violations: violations that "are less serious but are of more than minor concern; i.e., if left uncorrected, they could lead to a more serious concern." Id. In addition, the NRC recognizes that there may be some violations of "minor safety . . . concern" that are "not the subject of formal enforcement action." Id.
 
 
 43
 In this case, if the Company could demonstrate that the NRC itself -- if confronted with the Arbitrator's findings concerning O'Hearn's conduct -- would unequivocally deem O'Hearn's conduct so severe as to render him ineligible for future employment in licensed activities, then perhaps there would be a sufficient basis on which to conclude that his reinstatement would necessarily run contrary to public policy. But, as noted above, the NRC was not notified of O'Hearn's wrongdoing and thus, we are without definitive guidance as to the level to which O'Hearn's future employment represents an unacceptable threat to nuclear safety. Furthermore, as explained below, the NRC's actions in different cases do not establish with any degree of certainty that public policy would be offended by O'Hearn's continued employment.
 
 B. NRC Enforcement Actions
 
 44
 Consistent with its stated enforcement policy, the NRC's enforcement actions demonstrate that safety violations come in varying degrees of severity, and that not all violations compromise public safety to the same extent. Many reported enforcement actions involved individuals who deliberately omitted information from background questionnaires that they were required to fill out in order to gain "unescorted access" to nuclear facilities. The questionnaires are administered by licensees as part of their NRC-mandated access authorization programs, which, in turn, must allow the licensee to provide the NRC with "high assurance" that individuals to whom unescorted access is granted are "trustworthy and reliable" individuals, in compliance with 10 C.F.R. 73.56, the same regulation that the Company relies on in this case.
 
 
 45
 In a number of these cases, individuals who misrepresented information on security questionnaires received a five year ban from involvement in NRC-licensed activities. See, e.g., Order concerning Jeffrey Lee Barnhart, dated June 23, 1997, IA 97-049, 1997 WL 896225 (N.R.C.) (five year ban imposed where applicant falsified questionnaire to omit past criminal and drug history by assuming identity of his deceased brother); Order concerning Finis Scott Bandy, dated Nov. 19, 1997, IA 97-087, 1997 WL 896224 (N.R.C.) (five year ban imposed where applicant lied on questionnaire about the severity of his prior criminal convictions, altered copies of court records, and lied to investigators about his past criminal record); Order concerning Lonnie Randall Wilson, dated June 27, 1997, IA 97-050, 1997 WL 896230 (N.R.C.) (five year ban imposed where individual was convicted for lying repeatedly on background questionnaires by omitting prior positive drug test results and failing to note prior denials of unrestricted access; when caught the individual boasted to investigators that "it took three plants to finally catch" him, that he'd "made 30-40,000 dollars by lying" and that he "would do it again" if given the chance); Order concerning Douglas D. Preston, dated Apr. 5, 1994, IA 94-004, 1994 WL 876718 (N.R.C.) (five year ban imposed where individual lied repeatedly on access questionnaires by omitting past criminal history, and told investigators that he would do so again in the future if given the chance).
 
 
 46
 In these cases, in which the violators were dishonest about past criminal activity and sometimes indicated that they would continue to lie in the future, the NRC found that public safety would be compromised by any licensee's future employment of these individuals. The NRC often summarized its findings on that score by noting that it "lacked the requisite reasonable assurance that licensed activities can be conducted in compliance with the Commission's requirements and that the health and safety of the public would be protected" if the offending individual "were permitted at this time to be involved in NRC-licensed activities." See, e.g., Barnhart, 1997 WL 896225.
 
 
 47
 In other cases, however, dishonesty based infractions are classified as "Severity Level III" violations of "significant regulatory concern," see 63 Fed. Reg. at 26,634, but are not accompanied by orders prohibiting continued involvement in NRC-licensed activities. In such cases, the NRC notices the misconduct, communicates how seriously it views the violation, but stops short of banning the individual for any period of time. One such case is particularly relevant here, as it involves a security guard's malfeasance with respect to the cause and reporting of an alarm. Notice of Violation to Donald Smith, dated July 23, 1997, IA 97-056, 1997 WL 896242 (N.R.C.).
 
 
 48
 While Smith was working as a security guard at a nuclear facility, he intentionally triggered an alarm and thereafter lied to cover up his transgression. The NRC issued a Notice of Violation to Smith, categorizing his violation as Severity Level III. The notice made plain that the NRC viewed his initial misconduct and subsequent dishonesty very seriously, and noted that Smith had failed to uphold the "special trust and confidence which places nuclear employees in the position where their performance is expected to be above reproach." 1997 WL 896242. Although putting Smith on notice that "similar violations in the future could result in more significant enforcement actions," the NRC specifically chose not to ban Smith from NRC-licensed activities for any period of time. Id.
 
 
 49
 Other NRC enforcement actions have also stopped short of banning the violator from continued involvement in NRC-licensed activities and, in some cases, the NRC has afforded the offender an opportunity to satisfy the NRC that he could, in fact, be trusted to comply with regulations in the future. See,e.g., Notice of Violation to Steven R. Allent, dated Sept. 5, 1996, IA 96-050, 1996 WL 902684 (N.R.C.) (finding deliberate misconduct of Severity Level III where worker taped radioactively contaminated particle to underside of table and directing violator to provide "reasons as to why the NRC should have confidence that [he] will comply with NRC regulatory requirements in the future"); Notice of Violation to Michael Redlin, dated Dec. 8, 1997, IA 97-088, 1997 WL 896237 (N.R.C.) (finding Severity Level III violation where individual deliberately failed to report previous marijuana use on application for unescorted access authorization, warning that future violation could result in order "prohibiting involvement in NRC-licensed activities," and requesting individual to submit statement explaining how the NRC could be confident of his "future trustworthiness while engaged in licensed nuclear activities," and that he would "abide by regulations and procedures pertinent to [his] work"); Notice of Violation to John R. Raskovsky, dated June 18, 1997, IA 97-037, 1997 WL 854927 (N.R.C.) (finding individual's deliberate omission from security questionnaires to constitute a Severity Level III violation, reminding individual that the "public health, safety and trust demand that nuclear power plant personnel conduct themselves with integrity at all times," and informing individual that "in the future, any similar violation may result in more significant enforcement actions, including your removal from NRC-licensed activities").[6]
 
 
 50
 C. O'Hearn's Reinstatement Viewed in Light of NRC Enforcement Policy and Prior Enforcement Actions
 
 
 51
 The NRC, if faced with the Arbitrator's findings as to O'Hearn's actions, might well conclude that the Company would be unable to conduct licensed activities safely as long as O'Hearn was still employed. In particular, based on the Arbitrator's findings one might argue that O'Hearn violated the NRC's "Deliberate Misconduct Rule," found at 10 C.F.R. 50.5(a)(1). If the failure to report the alarm formed the basis of a violation of a Nuclear Safety Rule, subsection one would be violated, as it specifies that a licensee's employee may not "engage in deliberate misconduct that causes . . . a licensee . . . to be in violation of any rule, regulation, or order." There is an even greater likelihood, however, that O'Hearn violated section 50.5(a)(2), which prohibits employees from "deliberately submitting to the NRC [or its] licensee . . . information that the person submitting the information knows to be incomplete or inaccurate in some respect material to the NRC." 10 C.F.R. 50.5(a)(2). His deliberate submission of alarm information would be "material to the NRC" because, as the NRC has observed, "information concerning the cause and response to security alarms is material to the determination the licensee must make regarding the adequacy of their security program pursuant to 10 C.F.R. 73.55, and is information relied upon by the NRC and reviewed during security inspections." See Smith, IA 97-056, 1997 WL 896242.
 
 
 52
 But even assuming that O'Hearn did commit such a deliberate omission, that fact is insufficient to establish that his reinstatement, after a thirty day suspension, would be in direct conflict with the public policy as expressed in the NRC regulations. Rather, the NRC's previous enforcement decisions do not preclude the possibility that O'Hearn's conduct, while unacceptable, would be categorized as a Severity Level III violation and result in a stern rebuke but not a ban from future involvement in NRC-licensed activities.
 
 
 53
 The NRC's treatment of Donald Smith, supra, demonstrates this point. The decision not to ban Smith does not suggest that the NRC viewed Smith's conduct lightly, or that no consequences flow from his wrongdoing. To the contrary, he was put on clear notice that further wrongdoing would likely prevent his future eligibility for involvement in NRC-licensed activities. But the NRC'S course of action is significant here because, when faced with conduct similar to O'Hearn's, the NRC did not conclude, as it has in other cases, that it "lacked the requisite reasonable assurance that licensed activities can be conducted in compliance with the Commission's requirements and that the health and safety of the public would be protected" if Smith "were permitted . . . to be involved in NRC-licensed activities." See Barnhart, 1997 WL 896225. That conduct like Smith's can -- consistent with public policy as defined and interpreted by the NRC itself -- escape terminal censure highlights our inability to conclude that public policy unequivocally proscribes reinstatement of an employee like O'Hearn.
 
 
 54
 We simply cannot with reasonable certainty divine what result the NRC would reach in O'Hearn's case if it were to evaluate it in the first instance. Our inability to do so precludes us from vacating the reinstatement award on the ground that its enforcement would unequivocally violate public policy.
 
 
 55
 Looking, as we must, to "laws and legal precedents" rather than "general considerations of supposed public interests," Paperworkers v. Misco, Inc., 484 U.S. 29, 43, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987) (internal quotation marks omitted), and consistent with the analysis we have undertaken in this case, we can discern circumstances in which, despite an arbitrator's decision to reinstate a nuclear plant employee, a judicial override of that decision on the ground that the employee is not "trustworthy" and "reliable" would be warranted as a matter of public policy. For example, as NRC enforcement actions suggest, reinstatement may well be inappropriate for an employee who is habitually dishonest or who lies in an attempt to cover up criminal activity, particularly if it results in a conviction. See supra at 143 F.3d at 712-13. Moreover, in Iowa Electric, the Eighth Circuit affirmed the district court's refusal to enforce an award reinstating an employee who had wilfully disregarded safety procedures that were not merely "in house procedures," but rather rules that had been "put in place pursuant to a strict regulatory scheme devised by Congress for the protection of the public from the hazards of nuclear radiation." 834 F.2d at 1428.
 
 
 56
 None of these circumstances was present here: O'Hearn's conduct strikes us as grossly negligent, not wilful, and his lies, while reprehensible, were one-time attempts to cover up his mistake, not a criminal past. If the NRC, at the Company's request, had investigated the incident and determined that continued employment was incompatible with its "trustworthy" and "reliable" standard, that, too, would have constituted unequivocal evidence of a public policy prohibiting reinstatement. However, with the NRC regulations and precedents in their present posture, we are unable to conclude that Niagara Mohawk has met its burden of showing a clear and unequivocal public policy precluding reinstatement sufficient to override the arbitrator's award.
 
 
 57
 This is not, of course, to say that O'Hearn's termination would offend public policy; as did the district court, we believe that O'Hearn's dishonesty should not be countenanced. But the just cause for termination decision is a matter that the Company agreed to leave to the Arbitrator's discretion. By now asking us to overturn that bargained-for decision on public policy grounds, the Company submits to a much more exacting standard of review, one that it has not met. We are not charged with exercising the NRC's enforcement duties on its behalf. Rather, we are beholden to the "firmly-established, legislatively-entrenched policy favoring resolution of labor disputes through arbitration." Saint Mary Home, 116 F.3d at 45. That policy prevents us from overturning an arbitral award on public policy grounds unless it can be conclusively shown that a clearly defined and dominant public policy militates specifically against the award in question. Because such a showing has not been made here, the Company has not met its burden and the Award must stand.
 
 IV. Attorney's Fees
 
 58
 In its appellate brief, the Union also asks us to award it attorney's fees, costs and disbursements, claiming that a fee award is justified because the Company acted in bad faith when it refused to comply with the Award. It is unclear whether the Union is seeking fees incurred below or in the course of this appeal; in either case, however, the result is the same.
 
 
 59
 To the extent that the Union is seeking attorney's fees for work in connection with its appeal, its claim is meritless. The Company cannot be penalized for defending an appeal from a lower court decision in its favor. To the extent that the Union is seeking attorney's fees for work performed in the district court, its argument is disingenuous. The Union contends that the Company's refusal to enforce the Award was in bad faith in light of our decision in Niagara Mohawk I. But Niagara Mohawk I was decided over four months after the district court, relying on the district court decision in Niagara Mohawk I, ruled in the Company's favor in this case. The Union, therefore, cannot claim that the Company was acting in "bad faith, vexatiously, wantonly, or for oppressive reasons," Int'l Chemical Workers Union, Local No. 227 v. BASF Wyandotte Corp., 774 F.2d 43, 47 (2d Cir. 1985), when it forced the Union to seek judicial enforcement of the Arbitrator's Award. We decline to award attorney's fees in this matter.
 
 CONCLUSION
 
 60
 Employing the standards we set out in Niagara Mohawk I we conclude that the NRC's regulations, taken as a whole, "cannot accurately be interpreted to preclude a finding that someone who acts as [O'Hearn] acted could, nonetheless, be trustworthy and reliable as those terms are used by the [NRC]." Niagara Mohawk I, 143 F.3d at 721. Accordingly, the judgment of the district court is vacated. This matter is remanded to the district court with instructions to confirm the arbitration Award. The Union shall recover its costs on appeal.
 
 
 
 Notes:
 
 
 *
 Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.
 
 
 [1]
 1. The relevant CBA provision provides:
 If an employee represented by the Brotherhood hereunder is discharged from employment on or after the date hereof and believes that they have been unjustly dealt with, such discharge shall constitute a dispute or difference for determination under the method of adjusting grievances provided for in this Article XXII and such dispute shall be first taken up within three (3) working days . . . if it is thereupon determined that such discharge was wrongful and without just cause, the Company shall reinstate the employee and pay full compensation at the basic rate for all time lost or as may be appropriate.
 
 
 [2]
 Federal jurisdiction over this suit is proper under 29 U.S.C. 185(a), which provides:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 [3]
 10 C.F.R. 73.56 states in pertinent part:
 (b) General performance objective and requirements. (1) The licensee shall establish and maintain an access authorization program granting individuals unescorted access to protected and vital areas with the objective of providing high assurance that individuals granted unescorted access are trustworthy and reliable, and do not constitute an unreasonable risk to the health and safety of the public including a potential to commit radiological sabotage. . . . (3) The licensee shall base its decision to grant, deny, revoke, or continue an unescorted access authorization on review and evaluation of all pertinent information developed.
 
 
 [4]
 The district court also rejected the Arbitrator's conclusion that discharge was too severe a punishment, not so much on account of O'Hearn's "baffling, lackadaisical response to the alarm" as because of his "subsequent attempt to mask this Homer Simpson-like conduct." 1997 WL 793137, at *6.
 
 
 [5]
 Indeed, the district court's opinion in this case relied extensively on the district court decision that was reversed by this Court in Niagara Mohawk I. Thus, the district court in this case did not have the benefit of our opinion in Niagara Mohawk I.
 
 
 [6]
 The Company brings to our attention one other enforcement action. Notice of Violation to Charles J. Naivar, dated July 17, 1998, IA 98-035 (N.R.C.). There, Naivar failed to conduct a proper equipment safety inspection and then falsified procedural documentation to cover up his failure. The NRC noticed a Severity Level III violation of "significant regulatory concern," but did not impose a ban on future employment. In imposing that level of discipline the NRC gave "considerable weight" to the fact that Naivar already had been terminated from employment. At oral argument, the Company suggested that the fact that Naivar was terminated lent support to the argument that public policy dictated that O'Hearn, as well, should be terminated. But the NRC's implicit approval of Naivar's termination does not alone establish that continued employment would violate public policy as defined by the NRC. More probative of the latter proposition would be the NRC independent determination -- a determination it chose not to make in Naivar's case -- that the employee should be banned prospectively from involvement in any NRC-licensed activities. Our inability to conclude that such a result would obtain in O'Hearn's case is the reason we cannot vacate the Award.