N.Y.C. & Vicinity Dist. Council of the United Bhd. of Carpenters v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: April 19, 2016    Decided: June 20, 2016)

Docket No. 15-1574-cv

_____

NEW YORK CITY AND VICINITY DISTRICT COUNCIL OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA,

*Plaintiff-Counter-Defendant-Appellee,*

— v. —

ASSOCIATION OF WALL-CEILING AND CARPENTRY INDUSTRIES OF NEW YORK, INC.,

*Defendant-Counter-Claimant-Appellant.*[*]

_____

B e f o r e:

SACK, WESLEY, and LYNCH, *Circuit Judges.*

_____

[*] The Clerk of the Court is directed to amend the official caption in the case to conform to the caption above.

Defendant-appellant Association of Wall-Ceiling and Carpentry Industries of New York, Inc. ("WCC"), an employers' association, appeals from a judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*) vacating an award issued in an arbitration between WCC and plaintiff-appellee New York City and Vicinity District Council of the United Brotherhood of Carpenters and Joiners of America (the "District Council"). WCC and the District Council are parties to a collective bargaining agreement (the "CBA") that could not go into effect without the district court's approval, due to a prior consent decree settling a government civil RICO suit against the District Council. After the district court approved the CBA, WCC asserted that its members could elect to invoke its separate agreement with the District Council's parent union to supersede one of the CBA's provisions, and the arbitrator agreed. The district court vacated the award, holding that it did not draw its essence from the CBA and conflicted with the court's earlier order approving the CBA. We conclude, to the contrary, that the award was properly grounded in the arbitrator's application of the CBA, and that it does not violate the approval order. In light of the district court's ongoing role in monitoring the District Council, however, we remand the case to permit the district court to reconsider its decision to approve the CBA in light of the arbitrator's interpretation of it.

VACATED AND REMANDED.

---

MARK A. ROSEN, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, New York, *for Defendant-Counter-Claimant-Appellant*.

ANDREW D. ROTH, Bredhoff & Kaiser PLLC, Washington, District of Columbia (Adam Bellotti, Laurence Gold, Bredhoff & Kaiser PLLC, Washington, District of Columbia; James M. Murphy, Gillian Costello, Spivak Lipton LLP, New York, New York, *on the brief*), *for Plaintiff-Counter-Defendant-Appellee.*

---

2

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-appellee New York City and Vicinity District Council of the United Brotherhood of Carpenters and Joiners of America (the "District Council"), a regional council of local unions, and defendant-appellant Association of Wall-Ceiling and Carpentry Industries of New York, Inc. ("WCC"), an employers' association, are parties to a collective bargaining agreement (the "CBA"). Separately, WCC is a party to an agreement (the "International Agreement") with the District Council's parent "international" union, the United Brotherhood of Carpenters and Joiners of America ("UBC"). The CBA and the International Agreement contain inconsistent provisions governing the staffing of "two-man jobs" – i.e., jobs to be performed with two carpenters.[1] The District Council asserts that WCC must follow the CBA's two-man job provision, whereas WCC claims that its members may elect to invoke the International Agreement's provision to supersede that of the CBA.

This otherwise straightforward labor dispute gains a layer of complexity from the fact that, due to a prior consent decree settling a government civil suit

---

[1] For simplicity, we adopt the parties' shorthand and refer to the craftsmen who are members of the UBC and its local unions and who are employed by WCC's members as carpenters.

under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against the District Council, the CBA negotiated by the District Council and WCC could not go into effect without judicial approval. The parties' disagreement over the two-man job provisions arose after the district court (Richard M. Berman, *Judge*) approved the CBA. An arbitrator ruled in favor of WCC, and the District Council brought this action seeking vacatur of the arbitral award. The district court granted summary judgment to the District Council, holding that the award did not draw its essence from the CBA, and further that it violated the district court's earlier order approving the CBA.

We conclude, to the contrary, that the arbitrator properly exercised his authority to interpret the CBA, and that his award did not violate the judicial order of approval. Accordingly, we VACATE the judgment and REMAND the case to permit the district court to revisit its decision to approve the CBA with the benefit of the arbitrator's interpretation of its two-man job provision.

## BACKGROUND

### I. The Consent Decree and the Monitorship of the District Council

Some historical background is necessary to place the district court's decision in context. The story begins in 1990, when the government brought a

4

civil RICO action in the Southern District of New York against the District Council, alleging that it was controlled by organized crime, with predictable adverse consequences for non-mob-affiliated businesses and dissident union members. *See generally United States v. Dist. Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters*, 409 F. Supp. 2d 439, 440–41 (S.D.N.Y. 2006) ("*District Council I*"), *rev'd*, 229 F. App'x 14 (2d Cir. 2007) ("*District Council II*"). The case proceeded to a bench trial, but the parties announced mid-trial that they had agreed to settle the case by Consent Decree. Judge Charles S. Haight, Jr., to whom the case was originally assigned, approved the Consent Decree on March 4, 1994. *See id*. at 441.

The Consent Decree's stated purposes were to ensure "that there should be no criminal element or La Cosa Nostra corruption of any part" of the District Council and that the District Council would "be maintained and run democratically." Consent Decree at 2 (Docket No. 410).[2] To that end, the Decree called for the appointment of an Investigations and Review Officer ("IRO") with investigative powers and the authority to review and veto District Council

---

[2] Documents filed in the government's RICO action against the District Council are identified by docket entry number on the district court docket for that case, *United States v. District Council of New York City & Vicinity of the United Brotherhood of Carpenters*, No. 90 Civ. 5722 (S.D.N.Y. Sept. 6, 1990).

expenditures and changes to the union constitution or bylaws. The Decree also incorporated a number of rules governing the referral of union members to employers, and required the District Council to give notice to the government and to the IRO of any changes to those rules. The IRO and the government were given the power to veto such changes, subject to review by the district court on the question "whether the proposed change is consistent with the terms and objectives of this Consent Decree." *Id*. at 17, ¶ 12. The requirement of notice to the government was to remain in force until seven years after the end of the IRO's term, a period that ended on June 6, 2006. *United States v. Dist. Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters*, No. 90 Civ. 5722(CSH), 2007 WL 2265584, at *2 (S.D.N.Y. Aug. 6, 2007).

At the time of the Consent Decree, the District Council's collective bargaining agreements with employers contained a "50/50 rule," under which employers were free to select half of the carpenters on any particular job site from within the District Council membership, and the District Council referred the other half according to rules incorporated in the Consent Decree. *See District Council I*, 409 F. Supp. 2d at 444. Those rules required the District Council to refer members from its out-of-work list ("OWL") in the order in which they registered,

6

except that an employer could continue to select carpenters beyond its 50% quota if those carpenters had worked for that employer within the past six months. *See id*.

In 2001, however, the District Council renegotiated its collective bargaining agreements with employers' associations, replacing the "50/50 rule" with a new "request system." *See id*. at 444–48. The request system did away with the condition that, beyond the first 50% of the workforce at a job site, an employer could freely request only those carpenters who had worked for the employer within the past six months, effectively giving employers free rein to select all the carpenters on a job and all but eliminating the role of the OWL.[3]

Although the six-month condition was enshrined in the rules incorporated in the Consent Decree, the District Council did not inform the IRO or the government of its intention to abolish it. The government, asserting that the District Council had violated the Consent Decree's notice requirement, sought an order of contempt against the District Council and its president. The district

---

[3] The OWL retained its importance in collective bargaining agreements with independent employers not affiliated with an association. Those agreements, as renegotiated in 2001, firmly capped at 50% the proportion of a job site's workforce that an employer could select, ensuring that the other 50% would be referred from the OWL. *See District Council I*, 409 F. Supp. 2d at 444–45.

court denied the motion, *id.* at 456, but we reversed, holding that the notice requirement did not exclude from its ambit changes to job referral rules that were effected through new collective bargaining agreements. *District Council II*, 229 F. App'x at 18–19. On remand, and following briefing and discovery, the district court issued an opinion addressing the appropriate remedy for the District Council's contempt. *United States v. Dist. Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters*, 592 F. Supp. 2d 708 (S.D.N.Y. 2009) ("*District Council III*"); *see also United States v. Dist. Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters*, 618 F. Supp. 2d 326, 332–35 (S.D.N.Y. 2009) ("*Contempt Order*").

As relevant here, the district court voided the request system and reimplemented the 50/50 rule, modified to cap at 67% (50% freely selected from within the union membership and an additional 17% if the selected carpenters satisfied the six-month condition) the proportion of a job site's workforce that could be selected by the employer. *Contempt Order*, 618 F. Supp. 2d at 333–34 (¶ 3). The district court explained: "This resolution is fair and equitable because it recognizes contractors' economic and competitive concerns by allowing them to select most of the carpenter work force on any particular project, while restoring the [OWL] as a meaningful source of employment for carpenters

8

seeking work." *District Council III*, 592 F. Supp. 2d at 722. The district court also reinstated the Consent Decree's notice requirement, *Contempt Order*, 618 F. Supp. 2d at 334 (¶¶ 4–5), which, as noted above, had expired in 2006.

Meanwhile, the government continued to investigate the District Council. Its concern was no longer the influence of organized crime, but instead the practice of employers paying carpenters "off the books" at rates lower than those specified in collective bargaining agreements and failing to make contributions to the union's benefit funds. *See United States v. Dist. Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters*, No. 90 Civ. 5722(CSH), 2010 WL 2287008, at *2 (S.D.N.Y. June 3, 2010). That practice required the cooperation of dishonest local union shop stewards and District Council officers. *Id.* The unsealing, in August 2009, of an indictment against defendants associated with the District Council and with certain employers prompted the government and the District Council to enter into a new stipulation creating the position of Review Officer ("RO"), with wide-ranging powers similar to those of the IRO under the Consent Decree. *Id.* at *2–3; *see also* Stipulation and Order Regarding Appointment of a Review Officer (Docket No. 991) ("RO Stipulation"). The district court approved the stipulation on June 3, 2010.

9

## II. Approval of the CBA

In 2011, the District Council's collective bargaining agreements were once again up for renewal. Negotiations with WCC led to the parties' adoption of a four-page memorandum agreement, which was ratified by the District Council's Delegate Body on August 22, 2012. The agreement contained provisions on, among other things, wages, holidays, shift work, as well as the two-man job provision at issue in this appeal (discussed in more detail below) and a "manning provision." App'x 161. The manning provision envisioned replacing the 67:33 hiring ratio previously imposed by the district court as a contempt sanction with a new "full mobility" system, under which an employer could select all of the carpenters at any job site except for the second carpenter, who would be referred by the District Council and appointed shop steward.

The full mobility system could not be implemented without an order from the district court lifting the 67:33 hiring ratio, which would not be forthcoming unless the district court was satisfied that full mobility was consistent with the anti-corruption goals of the Consent Decree and the RO Stipulation. The parties were concerned, however, that allowing employers to select almost all of their workforce might exacerbate the problem of employers underpaying carpenters

off the books. As the RO later explained to the district court, "[b]y having a percentage of Union members who were not picked by the employers but rather were sent by the District Council, there was a counterpoise to 'company men' who might turn a blind eye to corruption." March 19, 2013 Letter of Dennis M. Walsh at 2 (Docket No. 1279). Accordingly, the District Council and WCC further agreed on a package of anti-corruption measures, which included equipping shop stewards with wireless devices for electronically reporting carpenters' hours to the District Council, creating a website on which carpenters could ascertain that their hours were accurately reported, and paying sixteen retired carpenters to conduct spot inspections of job sites. *See* February 13, 2013 Letter of James M. Murphy at 2–7 (Docket No. 1223).

On February 27, 2013, Judge Berman (to whom the case had by then been reassigned) held a hearing on the proposed package of hiring provision changes and anti-corruption measures. The District Council, WCC, the government, and the RO all spoke in favor of the package. The only negative note was sounded by several rank-and-file members of the District Council who were invited to speak.[4]

---

[4] Several of those members emphasized that the full mobility provisions had been rejected by a vote of the rank-and-file membership. The RO explained, however, that under the District Council's bylaws, the authority to approve collective bargaining agreements rests with the delegate body.

11

The parties summarized the history of the case and explained to the court their concern about corruption. The discussion then turned to an extensive review of the anti-corruption measures and technology. Except during the colloquies with the rank-and-file members, there was essentially no debate over the merits of the full mobility provisions, and – importantly – only one brief mention of the two-man job provision. At the conclusion of the hearing, the district court expressed its reluctance to approve the CBA before it was finalized. On April 11, after the parties submitted a finalized version, the district court directed the District Council to seek ratification from the delegate body, which the District Council obtained on April 25.[5]

Finally, on May 8, 2013, the district court issued an order approving the CBA. It began by noting that rank-and-file District Council members, who had submitted many petitions and letters to the court, did not "appear to have 'standing' to litigate this proceeding regarding the CBA." App'x 302. It then stated: "The District Council and the RO have argued persuasively that the (new)

---

[5] Though the CBA was signed on March 12, 2013, and ratified on April 25, 2013, the parties agreed that it would be effective from July 1, 2011 through June 30, 2017, and thereafter would be renewed automatically for one year intervals unless either party provided written notice of its intent to negotiate a new agreement.

12

CBA is advantageous for both the carpenters in the Union and the contractors in [WCC]," App'x 303, emphasizing the wage increases conceded by WCC in exchange for full mobility, the anti-corruption compliance package, and the fact that the District Council had been without a collective bargaining agreement since the expiration of the previous version on June 30, 2011. It noted that the government and the RO had approved the CBA, and that the District Council's delegate body had ratified it. It explained that "the ability of the contractors to select the carpenters they employ appears to have been freely bargained for with the Union, resulting in, among other things, a higher wage component." App'x 307. "Most importantly," the district court concluded, "the CBA is a bargained over agreement and was approved by the Executive Committee of the District Council and by the Delegate Body of the District Council, lawfully designated representatives with the authority to approve collective bargaining agreements." App'x 308. Accordingly, the court approved the CBA, and it went into effect. In approving the CBA, the court made no mention of UBC and WCC's separate International Agreement.

III. **This Dispute and the Resulting Arbitration**

The District Council's geographical jurisdiction is limited to the five

13

boroughs of New York City and a small portion of Nassau County, but WCC's

members are located throughout the broader New York City metropolitan area,

including within the jurisdiction of other regional district councils of UBC. The

CBA limits WCC's ability to hire carpenters affiliated with those other regional

district councils – whom the parties call "out-of-towners" – by requiring out-of-

towners to be matched one-for-one with carpenters referred by the District

Council. Thus, under the CBA, an employer's decision to hire out-of-towners

comes at the price of giving up some control over the selection of its workforce.

The out-of-towner matching rule applies to all jobs covered by the CBA, but is

repeated explicitly in the provision governing two-man jobs. That provision

reads, in relevant part:

> For jobs only requiring two (2) employees, the Employer
> will be permitted to work without a certified shop
> steward without a time limitation. Any employee who
> is not a member of the District Council will be matched
> 1:1 from the District Council's Job Referral List. The
> Union will assign one (1) of the two (2) members with
> the duties of the shop steward.

App'x 75–76. It further provides that if an employer fails to report the two-man

job to the District Council or employs more than two carpenters without a shop

steward, that employer will lose the right not to staff a shop steward on two-man

14

jobs for the remainder of the term of the CBA.

The International Agreement also contains an out-of-towner matching provision, but it does not apply to two-man jobs. Instead, an employer is "permitted to bring in two (2) 'key' traveling employees from its home area to perform required work in any jurisdiction or geographical area of [UBC] without the necessity of securing work permits," provided that it informs the local council of the project and its intended duration. App'x 44. If the employer requires more than the two "key" traveling employees, however, it must request the next two employees from the local council, and thereafter must match out-of-towners one-for-one with members of the local council.[6]

Shortly after the district court approved the CBA, a dispute arose between the parties over whether WCC members could invoke the International Agreement to supersede the CBA's out-of-towner matching provision on two-man jobs. The parties submitted the dispute to arbitration, and on July 22, 2014, the arbitrator, Howard C. Edelman, issued an award recognizing WCC's right to

---

[6] UBC and WCC signed the International Agreement on August 19, 2013. The parties agreed that the International Agreement would be effective from July 1, 2013 to June 30, 2016, and that it would "automatically renew itself for subsequent one year periods unless written notice to terminate or modify is given by either party." App'x 53.

invoke the International Agreement. He relied, first, on unrebutted evidence that WCC members had for years been able to invoke WCC's international agreements without objection from the District Council. Had the parties intended to put an end to that longstanding practice, the arbitrator reasoned, "they would have said so in no uncertain terms." App'x 27. The arbitrator also considered evidence that the District Council's negotiator believed that the CBA's two-man job provision would obviate the need to invoke the International Agreement on that issue. The arbitrator explained, however, that discouraging the use of international agreements "hardly equates to giving up the right to use them. To the contrary, it strongly suggests [that] they may still be invoked but . . . [that] they would not be utilized very often, if at all." App'x 28–29.

## IV.    Procedural History of this Action

The District Council then brought this action, seeking vacatur of the arbitral award. WCC counterclaimed, seeking confirmation of the award. The parties cross-moved for summary judgment. On April 27, 2015, the district court granted the District Council's motion and vacated the award, concluding that the award did not draw its essence from the CBA – the contract that the arbitrator was supposed to have interpreted – and that the award also violated the court's

16

order approving the CBA. *N.Y.C. & Vicinity Dist. Council of the United Bhd. of Carpenters v. Ass'n of Wall-Ceiling & Carpentry Indus. of N.Y., Inc.*, No. 14 Civ. 6091, 2015 WL 1938148, at *5–6 (S.D.N.Y. Apr. 27, 2015). As to the first ground for vacatur, the district court stated that "[t]he two man job provision in the CBA is a bargained-for clear and unequivocal limitation to full mobility," *id*. at *3 (emphasis omitted), and that "there is no reason to believe that the CBA does not reflect the parties' agreement as to two-man jobs," *id*. at *4. As to the second, the district court held that the award was "squarely contrary" to its order approving the CBA, "which confirm[ed] the unambiguous, bargained-for [CBA]'s two man job provisions reached between District Council and WCC." *Id*. at *6.

WCC timely appealed.

## DISCUSSION

"[A] federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential – indeed, among the most deferential in the law." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, __ F.3d __, 2016 WL 1619883, at *1 (2d Cir. 2016) ("*NFL*"). A court is "not authorized to review the arbitrator's decision on the merits"; its role is simply to determine "whether the arbitrator acted within the scope of his authority as defined by the

17

collective bargaining agreement." *Id.* at *6. Thus, as long as "the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority and did not ignore the plain language of the contract," the award should ordinarily be confirmed. *Id.* (internal quotation marks omitted). Conversely, a court should vacate an award if it "contradicts an express and unambiguous term of the contract or . . . so far departs from the terms of the agreement that it is not even arguably derived from the contract," *United Bhd. of Carpenters v. Tappan Zee Constructors, LLC*, 804 F.3d 270, 275 (2d Cir. 2015) – in other words, if the award does not "draw[] its essence from the collective bargaining agreement" but reflects instead "the arbitrator's own brand of industrial justice." *NFL*, 2016 WL 1619883, at *6 (internal quotation marks omitted).

The Supreme Court has also recognized a second circumstance warranting vacatur of a labor arbitration award: "[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy," such as "obedience to judicial orders." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983). We have emphasized, however, that the public policy ground for vacatur is "extremely limited." *Local*

18

*97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999). A court's task in applying that principle is limited to determining "whether the award itself, as contrasted with the reasoning that underlies the award, creates an explicit conflict with other laws and legal precedents and thus clearly violates an identifiable public policy." *Id*. (alterations and internal quotation marks omitted).

The district court concluded that both grounds for vacatur were satisfied here. On appeal, however, the District Council relies principally on the public policy ground; its counsel conceded at oral argument that there would be no basis for vacating the award were it not for the fact that the CBA was subject to judicial approval.

We agree that, to the extent the district court's judgment rests on the basis that the award did not draw its essence from the CBA, it must be vacated. Rather than dispensing his "own brand of industrial justice," the arbitrator addressed the narrow question whether the CBA forecloses the invocation of the International Agreement's two-man job provision. Relying on the parties' history of allowing invocation of the International Agreement and on the CBA's negotiating history, he concluded that the CBA's silence on the issue indicated

19

that the parties did not intend to change that practice and thus supported WCC's position.  That conclusion is at least arguably derived from an interpretation of the CBA itself and contradicts none of its "express and unambiguous" terms.  Further, the arbitrator was careful to emphasize the limited scope of his decision, explaining that he was not ruling on the meaning of the International Agreement's two-man job provision or on when that provision could properly be invoked.[7]  Although it might have been equally reasonable for the arbitrator to have agreed with the District Council, a federal court is not authorized to decide whether the arbitrator's interpretation of a collective bargaining agreement was correct on the merits.  *NFL*, 2016 WL 1619883, at *6.  The arbitrator's decision here comfortably survives our tightly circumscribed scope of review.

We further conclude that the public policy ground for vacatur does not apply here either.  As in *W.R. Grace*, the public policy at issue here is that of respect for court orders.  *W.R. Grace*, 461 U.S. at 766.  The District Council argues that the award violates the district court's May 8, 2013 order approving the CBA,

---

[7] If the arbitrator had jurisdiction to interpret the International Agreement, he could have relied on § 1.3 of that agreement, which provides that in case of conflict with "the applicable Local Union or Council agreement, the provisions of this Agreement shall supersede those contained in the Local Union or Council agreements, unless prohibited by law or court order."  App'x 39.  The arbitrator, however, carefully confined himself to his assigned task of interpreting the CBA.

because it permits a practice – staffing two out-of-towners on a two-man job – that is explicitly prohibited by the CBA. That argument would have more force if there were any indication that the two-man job provision's out-of-towner matching requirement was central to the district court's decision to approve the CBA. But the two-man job provision received only one mention during the February 27, 2013 hearing, and the matching requirement was not discussed at all. The May 8, 2013 order contains only one oblique reference to the two-man job provision and also does not mention the matching requirement. (That is not surprising, given that previous collective bargaining agreements also contained an out-of-towner matching requirement; that requirement's inclusion in the new CBA was thus not a change on which the district court could be expected to have focused.) Further, in its decision vacating the award, the district court did not suggest that its approval of the CBA had depended in any way on the matching requirement and instead simply emphasized that the two-man job provision was part of the parties' bargained-for agreement.[8]

[8] In addition to arguing that the district court never relied on the matching requirement in approving the CBA, WCC claims that that requirement is of "dubious validity." Appellant's Br. 31. Earlier this year, a three-member panel of the National Labor Relations Board ("NLRB") affirmed the finding of an administrative law judge that an identical matching requirement in another of the District Council's collective bargaining agreements violated § 8(a)(1) of the

21

Moreover, the District Council's argument founders on the fact that, in light of the arbitrator's decision, we now know that the contention that the CBA approved by the district court prohibits the practice in question is inaccurate: for our purposes, the CBA means what the arbitrator said it means. To the extent that the district court held that the arbitrator's decision violated the court's order because the decision was inconsistent with the CBA that the order approved, the district court effectively replaced the arbitrator's interpretation of the CBA with its own – something the court may not do.

The view that the award explicitly conflicts with the May 8, 2013 order approving the CBA becomes particularly unpersuasive when the approval order is considered in light of the history of the district court's monitorship of the District Council. As that history shows, the district court's approval was necessary because the CBA's full mobility provisions required lifting the 67:33 ratio which was imposed as a sanction for violating the Consent Decree's notice requirement. The district court's authority to block the implementation of the

National Labor Relations Act, 29 U.S.C. § 158(a)(1), by impermissibly encouraging workers to join the District Council and leave other regional councils. *Cement League*, 363 N.L.R.B. No. 117 (2016). (The District Council's petition to this court for review of the NLRB's decision is docketed at No. 16-495.) The legality of the matching provision is not before us, however, and we express no opinion on the question.

CBA was thus derivative of the Consent Decree itself. But the Consent Decree does not give the district court wide-ranging powers to decide what would be a fair settlement between the District Council and employers or to review the substance of collective bargaining agreements as a matter of labor policy. To the contrary, the district court's task under the Consent Decree's notice requirement is to determine "whether [a] proposed change [to hiring practices] is consistent with the terms and objectives of [the] Consent Decree," Consent Decree at 17, ¶ 12 – namely, union democracy and the prevention of corruption.

Viewed through that lens, the May 8, 2013 order cannot have hinged on a finding that the two-man job provision (or, for that matter, any other provision of the CBA) was the fairest, most desirable staffing rule for carpenters and their employers. Instead, it hinged on a finding that the CBA was properly approved by the District Council bodies vested with that authority and that its full mobility provisions are accompanied by meaningful anti-corruption measures. The order itself says very little about the merits of full mobility, and states that the "[m]ost important[]" factor in the district court's decision was the fact that "the CBA is a bargained over agreement [that] was approved by the . . . lawfully designated representatives with the authority to approve collective bargaining agreements."

23

App'x 308. There is no "explicit conflict," *Niagara Mohawk*, 196 F.3d at 125,

between that finding and the arbitrator's conclusion that employers may invoke

the International Agreement to supersede the CBA's two-man job provision. *Cf.*

*United States v. Int'l Bhd. of Teamsters*, 954 F.2d 801, 808 (2d Cir. 1992) ("[T]o the

extent an arbitration award is inconsistent with an order implementing the

Consent Decree, the Consent Decree order must govern.").

The decision below suggests that the district court may have interpreted

WCC's position as an attempt to elude the court's authority to approve the CBA

by modifying the CBA retroactively. For instance, the decision quotes "the

assurances of WCC's counsel" at the February 27, 2013 hearing that the draft

CBA then before the district court "is what needs to be approved by the Court,"

*WCC*, 2015 WL 1938148, at *6 (emphasis omitted), indicating an absence of other

hiring-related terms. *See also id*. at *6 n.16 (quoting the district court's statement

at oral argument that the two-man job provision "is clearly a part of the full

mobility regime . . . that was changed fairly dramatically in this collective

bargaining agreement. When I signed the order, that's what I understood."). But

that impression merely reflects the district court's disagreement with the

arbitrator's interpretation of the CBA: the district court viewed the CBA's silence

24

on the International Agreement as foreclosing its invocation, rather than allowing it. As we have explained, the Consent Decree empowers the district court to approve deviations from previously sanctioned hiring ratios, not to continue to interpret collective bargaining agreements indefinitely into the future. The arbitrator's conclusion on that question of interpretation was thus entitled to deference.

We recognize, however, that in light of the arbitrator's award, it now appears that the district court's decision to approve the CBA was based on incomplete information. The parties agree that the existence of the International Agreement was never brought to the district court's attention while the CBA was before it for approval.[9] As we have noted, the decision below does not state that the district court would not have approved the CBA if it had known that its two-

---

[9] The District Council assigns the blame for this omission to WCC, arguing that WCC's failure to apprise the district court of its view that it could invoke the International Agreement on the two-man job issue "showed disrespect for the integrity of the judicial process." Appellee's Br. 18. It does not, however, explain why it was WCC's burden to bring up the subject. Indeed, given that the District Council understood the CBA to effect a *change* in practice by foreclosing invocation of the International Agreement where it had previously been allowed, the onus was arguably on the District Council to call the district court's attention to that change. In any event, neither side brought the International Agreement and its relationship to the CBA to the court's attention, with the result that the court was unaware of the correct terms of the CBA it was approving.

man job provision could be superseded by the International Agreement, or suggest any reason why the court might not have done so. The District Council argues, however, that the two-man job provision's matching requirement serves an important anti-corruption purpose by guaranteeing that there will be at least one District Council member on such jobs who can make use of the anti-corruption oversight tools provided by the CBA. Moreover, it is the district court's responsibility to assess the CBA's consistency with the anti-corruption goals of the Consent Decree before the CBA can take effect. If the CBA did not, in some significant way, mean what the district court understood it to mean when it granted its approval, it is appropriate that the district court have the opportunity to revisit its approval decision in light of the arbitrator's interpretation of the CBA.

Given the district court's ongoing role in monitoring the District Council, therefore, we believe that the district court should be permitted to evaluate the District Council's arguments that the matching provisions serve an important anti-corruption purpose that would be undermined if those provisions may be avoided by invocation of the International Agreement, and to revisit its decision approving the CBA if it finds those arguments persuasive. We emphasize that

26

the district court's role is to decide whether the CBA, as now interpreted, is consistent with the goals of the Consent Decree, and not whether the CBA, as so interpreted, is generally in the interest of one side or the other, or represents what the court believes is a fair and appropriate settlement. Accordingly, we remand the case to the district court for consideration of the limited question whether the CBA, as interpreted by the arbitrator to allow invocation of the International Agreement with respect to two-man jobs, is consistent with the anti-corruption goals of the Consent Decree and the RO Stipulation.

## CONCLUSION

Because the arbitral award is properly grounded in an interpretation of the CBA and does not violate the May 8, 2013 order, we VACATE the district court's judgment vacating the award, and REMAND the case for further proceedings consistent with this opinion.